UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES LLC,<br><br>                      Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY, and ALLSTATE FINANCIAL SERVICES, LLC,<br><br>                      Defendants. | Civil Action No. 7:25-cv-01110-JGLC |

**DEFENDANTS ALLSTATE INSURANCE COMPANY AND ALLSTATE
FINANCIAL SERVICES, LLC'S SEPARATE
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendants Allstate Insurance Company ("Allstate") and Allstate Financial Services, LLC ("AFS") submit this Statement of Undisputed Facts in support of their Motion for Summary Judgment:

**A.     James Lukezic Creates the "Old Slip" Group of Businesses**

1.     James Lukezic is an Ivy League-educated, sophisticated financial professional with more than twenty years of experience in the securities and insurance industries. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 28; 40-42.

2.     After building a career in the financial services industry, James Lukezic created what he calls the "Old Slip" group of businesses. *Id.* at 41:18–25; 42:3–18.

3.     The "Old Slip" group of businesses consists of three entities:

- **Old Slip Registered Investment Advisors, LLC**, a registered investment adviser ("RIA") that provides investment advisory services—generally limited to mutual funds, fixed income securities, real estate funds, and insurance products including annuities—to pension and other employee benefit plans and high net worth

individuals, *see id.* at 42:12–18; Young Decl., Ex. 2 (Form ADV 2024); Young Decl., Ex. 3 (Form ADV Part 2A 2024);

- Plaintiff **Old Slip Benefits & Insurance Services, LLC**, a licensed insurance agency, *see* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 42:12–18; Young Decl., Ex. 6 (web capture of Plaintiff's insurance license information); and

- **Old Slip Capital Management, Inc.**, a broker-dealer ("BD") that acts as a mutual fund retailer and a broker-dealer selling variable life insurance and annuities, *see* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 42:12–18; Young Decl., Ex. 4 (Old Slip Capital Management, Inc. FINRA BrokerCheck Report).

4. In 2024 SEC filings, Lukezic disclosed that all three Old Slip entities are affiliated and under Lukezic's common control, they share the same physical location, and the BD and Plaintiff share supervised persons. Young Decl., Ex. 2 (Form ADV 2024), Sections 7 and 7A; Young Decl., Ex. 4 (Old Slip Capital Management, Inc. FINRA BrokerCheck Report) at 12.

5. Lukezic also acknowledged potential conflicts of interest arising from those affiliations. *See* Young Decl., Ex. 3 (Form ADV Part 2A 2024) at 10–11.

6. Lukezic formed Plaintiff in 2018 because he did not have an affiliation with an insurance agency or a broker-dealer, which is necessary to sell products like variable annuities and life insurance. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 44: 4-15; 47: 7-17.

7. Lukezic meets those pre-conditions now: he holds series 7 and 66 FINRA licenses and is registered with his BD and RIA, *see* Young Decl., Ex. 5 (Lukezic FINRA BrokerCheck Report); and he is a licensed property and casualty and life and accident insurance agent in multiple states, including New York, where Plaintiff is listed as his sublicensee, *see* Young Decl., Ex. 7 (web capture of James Lukezic's insurance license information); Laury Decl., Ex. A.

8. Those licenses reflect several active life and accident appointments with several insurance companies, including Prudential Insurance Company of America ("Prudential"), Transamerica Financial Life Insurance Company, Federal Insurance Company, and others. Young Decl., Ex. 7 (web capture of James Lukezic's insurance license information); *see also* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 47:18–22.

9. After forming Plaintiff in 2018, Lukezic began selling Prudential and other variable annuities to the participants of his 401(k) plans—customers of his RIA business—and he continues to do so today. Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 45, 46: 13-17.

10. At the time it was formed in 2018, Plaintiff did not sell any property and casualty insurance, *id.* at 48: 9-12, 36: 2-9, but it aimed to acquire individual independent agencies from larger names like Allstate, *id.* at 49: 9-18.

### B. Lukezic Buys Economic Interests in Two Existing Allstate Exclusive Agencies

11. Allstate offers its products through an exclusive-agency program consisting of independent agents, who either buy an economic interest in an existing agency or open a new one, Young Decl., Ex. 8 (Old Slip 0000880), and operate under a standard-form contract. Stevenson Decl., ¶ 4.

12. Lukezic was first introduced to Allstate as a prospective buyer of an interest in an existing exclusive agency on August 31, 2023. *See* Young Decl., Ex. 9 (Allstate_011501).

13. Shortly after his first interaction with Allstate, Lukezic contacted Wintrust Bank to secure financing, *see* Young Decl., Ex. 10 (Allstate_076988) and prepared a business plan for his future agency, *see* Young Decl., Ex. 11 ("Lukezic's Business Plan").

14. Lukezic ultimately purchased economic interests in two existing Allstate exclusive agencies from sellers Anthony Fava and Alfred Buglione. *See* Young Decl., Ex. 13 (Fava Asset

Purchase Agreement); Young Decl., Ex. 14 (Buglione Asset Purchase Agreement); Young Decl., Ex. 15 (Fava R3001 Exclusive Agency Agreement); Young Decl., Ex. 16 (Buglione R3001 Exclusive Agency Agreement).

15. The Fava and Buglione R3001 Exclusive Agency Agreements contain identical "Transfer of Interest" provisions which provide: "Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company. A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it. Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company. Agency has the obligation to notify the Company of a proposed transfer and to request Company approval." Young Decl., Ex. 15 (Fava R3001 Exclusive Agency Agreement) § XVI.A; Young Decl., Ex. 16 (Buglione R3001 Exclusive Agency Agreement) § XVI.A.

16. The Fava and Buglione Agreements further state: "Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee." Young Decl., Ex. 15 (Fava R3001 Exclusive Agency Agreement) § XVI.C; Young Decl., Ex. 16 (Buglione R3001 Exclusive Agency Agreement) § XVI.C.

17. Lukezic hired a lawyer to execute purchase agreements with sellers Fava and Buglione. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 159-161; 176: 3-10, 57: 7:17 (explaining his attorney is number one trust and tax attorney in the country).

18. Allstate was neither a party to Plaintiff's sale transactions with Fava and Buglione, nor had any financial interest in them. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 159:16–23.

19. Allstate approved Lukezic's purchase on December 4, 2023, and sent him instructions for next steps, including licensing and proof of capital. *See* Young Decl., Ex. 12 (Allstate_059902-Allstate_059903). Allstate's approval was conditioned upon the termination of the Fava and Buglione R3001 Exclusive Agency Agreements and Plaintiff's executing the then current R3001 Exclusive Agency Agreement. Young Decl., Ex. 15 (Fava R3001 Exclusive Agency Agreement) § XVI.C; Young Decl., Ex. 16 (Buglione R3001 Exclusive Agency Agreement) § XVI.C; *see also* Young Decl., Ex. 26 (EA Manual) at 6 ("You may not execute a transfer of your interest in your R3001 Agreement or any interest in the business under the Agreement without the prior written approval of the Company. This includes, but is not limited to, any sale . . . . You must notify the Company of any proposed transfer of your interest and obtain prior written approval from the Company.").

20. Both sellers agreed to be paid partially at closing and received a note from Plaintiff for the remaining amounts to be paid in twenty-four equal monthly installments. *See* Young Decl., Ex. 14 (Buglione Asset Purchase Agreement) § 2.6.1; Young Decl., Ex. 13 (Fava Asset Purchase Agreement) § 2.6.1.

21. Lukezic partially funded the upfront payment with a loan from Lake Forest Bank & Trust Company, N.A. ("Lake Forest Bank"). *See* Young Decl., Ex. 17 (Plaintiff's Initial Disclosures).

22. To cover the amounts owed to Buglione, Fava, and Lake Forest Bank, Lukezic entered into three separate Commission Payment Agreements. *See* Young Decl., Ex. 18 (Fava Assignment of Commission Documents); Young Decl., Ex. 19 (Buglione Assignment of

Commission Documents); Young Decl., Ex. 20 (Lake Forest Bank Assignment of Commission Documents).

23. "An Assignment of Commission is a contract that an Agency and Lender (seller and/or third party providing financing) may choose to enter into that allows the Lender to obtain a fixed payment from the commission paid monthly to an Agency." *See* Young Decl., Ex. 18 (Fava Assignment of Commission Documents), Allstate_064305; Young Decl., Ex. 19 (Buglione Assignment of Commission Documents), Allstate_064318; Young Decl., Ex. 20 (Lake Forest Bank Assignment of Commission Documents), Allstate_000258.

24. Allstate charges a processing fee to enter into the Assignment of Commission Agreement. *See* Young Decl., Ex. 18 (Fava Assignment of Commission Documents), Allstate_064305; Young Decl., Ex. 19 (Buglione Assignment of Commission Documents), Allstate_064318; Young Decl., Ex. 20 (Lake Forest Bank Assignment of Commission Documents), Allstate_000258.

25. The amount of the fee varies based on the length of the contract, and the fee is waived if the agency owner changes his business relationship with Allstate within six months of the commencement. *See* Young Decl., Ex. 18 (Fava Assignment of Commission Documents), Allstate_064318; Young Decl., Ex. 19 (Buglione Assignment of Commission Documents), Allstate_064318; Young Decl., Ex. 20 (Lake Forest Bank Assignment of Commission Documents), Allstate_000258.

26. Plaintiff entered into the Assignment of Commission Agreements because the sellers' attorneys wanted a guarantee that they would get paid monthly. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 184: 7-15.

27. Lukezic understood why the sellers requested such an arrangement because if they did not go through Allstate Lending Connection and the commissions came directly to him, in theory, he could withhold payment of the seller's note. *Id.*

28. Lukezic requested to grant security interests to all three lenders. *See* Young Decl., Ex. 21 (Fava Security Interest Documents); Young Decl., Ex. 22 (Buglione Security Interest Documents); Young Decl., Ex. 23 (Lake Forest Bank Security Interest Documents).

29. "A Security Agreement is an agreement that an Agency and Lender (Seller and/or third party providing financing) may choose to enter into that allows the Lender to obtain a security interest in the Agency's economic interest in a book of business." *See* Young Decl., Ex. 21 (Fava Security Interest Documents), Allstate_036934; Young Decl., Ex. 22 (Buglione Security Interest Documents), Allstate_036945; Young Decl., Ex. 23 (Lake Forest Bank Security Interest Documents), Allstate_037029.

30. A processing fee of $25 is required to enter into the Security Agreement. *See* Young Decl., Ex. 21 (Fava Security Interest Documents), Allstate_036934; Young Decl., Ex. 22 (Buglione Security Interest Documents), Allstate_036945; Young Decl., Ex. 23 (Lake Forest Bank Security Interest Documents), Allstate_037029.

31. The Pre-Appointment Agreement that Lukezic signed provided that "to be offered an R3001 Agreement with Allstate," the applicant had to complete "all requirements of the Allstate Exclusive Agency pre-appointment program" and agree to "all of the current terms and conditions of the R3001 Agreement and its incorporated materials." Young Decl., Ex. 24 (Pre Appointment Agreement) § I.B.

32. After Allstate approved Lukezic's purchase of the interests in the two agencies on December 4, 2023, he gained access to those incorporated materials, including the Supplement for

the R3001 Agreement ("Supplement"), the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") through the Allstate Gateway portal. *See* Young Decl., Ex. 24 (Pre Appointment Agreement) § I.B; Young Decl., Ex. 25 (R3001C Agreement) § XXI.D; Stevenson Decl., ¶ 4; Stevenson Decl., Ex. A.

33. Lukezic executed the purchase agreements with the sellers on January 2, 2024, while having access to those materials. *See generally* Stevenson Decl., ¶ 4; Young Decl., Ex. 14 (Buglione Asset Purchase Agreement); Young Decl., Ex. 13 (Fava Asset Purchase Agreement).

34. Lukezic also submitted an Ownership Disclosure Form to Allstate on February 5, 2024, while having access to those materials. *See generally id.; see also* Laury Decl., Ex. B (Ownership Disclosure Form).

35. In that Agency Ownership Disclosure Form, Lukezic answered "no" when asked whether Plaintiff had any affiliated companies, "no" when asked whether he was then acting as an agent or broker for any other insurance company, and "no" when asked whether he had any ownership interest in or operated any business other than the agency. *Id.*

36. At the time he executed the Agency Ownership Disclosure Form, Lukezic was acting as an agent for multiple insurance companies with which he had active life and accident appointments and owned and operated his BD and RIA businesses, both of which are affiliated with Plaintiff. *See* Statement of Undisputed Facts, *infra.* at ¶¶ 5-7.

**C.  Plaintiff and Allstate Execute the R3001C Exclusive Agency Agreement**

37. Allstate executed the R3001C Exclusive Agency Agreement ("Agreement") with Plaintiff on February 21, 2024, with an effective date of March 1, 2024, "in reliance upon and in consideration of the skills, qualifications, and representations of James Lukezic." Young Decl., Ex. 25 (R3001C Agreement) § II.E.

38. The Agreement contains an integration clause providing that it represents "the sole and entire agency agreement" between the parties, "supersedes and replaces any prior employment, agency, or other agreement between [Allstate] and [Plaintiff] and any of its officers, directors, shareholders, members, and employees," and "supersedes any prior oral statements and representations by [Allstate] and any prior written statements and representations by [Allstate]." Young Decl., Ex. 25 (R3001C Agreement) § I.B.

39. The Agreement also contains a no-modification clause, providing that it "may not be modified except by a written agreement between [Allstate] and [Plaintiff] which expressly states that it modifies this Agreement," that no "other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement," and that no "representative of [Allstate] will have authority to modify this Agreement, except as provided in this Section XXI." Young Decl., Ex. 25 (R3001C Agreement) § XXI.C.

40. Under the Agreement, Allstate appointed Plaintiff "as its agent to represent [Allstate] in the Exclusive Agency Program," for the purpose of receiving and accepting "applications for insurance," on Allstate's behalf, subject to such restrictions on binding authority as Allstate may establish as well as other products through the companies specified in the Supplement. *Id.* § I.A.

41. The Agreement provides: "Agency will act as an agent of the Company for purposes of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement." *Id.* § II.A.

42. The Agreement provides: "[t]he Company will own all business produced under the terms of this Agreement." *Id.* § I.A.

43. The Agreement provides: "[t]he sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commission set forth in the Supplement, as may be amended from time to time." *Id.* § XV.A.

44. The Agreement provides: "All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company." *Id.* § XIV.

45. Plaintiff owns the economic interest in Allstate customer accounts it purchased from Fava and Buglione and can realize that interest at termination or sell it to another prospective exclusive agent with Allstate's approval. Young Decl., Ex. 26 (EA Manual) at 29.

46. The Agreement provides that either party may terminate the Agreement without cause upon ninety (90) days prior written notice. Young Decl., Ex. 25 (R3001C Agreement) § XVII.B.2. Upon termination, agent is entitled to receive compensation from Allstate pursuant to Section XV of the Agreement for the period up to and including the specified termination date. *Id.*

47. When Plaintiff signed the Agreement, it expressly acknowledged that it had reviewed the Supplement, EA Manual, and Agency Standards, agreed that it had an ongoing responsibility to review all changes to those materials, agreed to be bound by them, and further acknowledged that it had read the Agreement, understood it, and agreed to be bound by its terms. Young Decl., Ex. 25 (R3001C Agreement) §§ XXI.D, XXI.F.

48. The Agreement provides, among other restrictions, that "Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company." *Id.* § I.E.

49. The EA Manual states that "[a]s an R3001 Agent, you are an *exclusive writer for Allstate*, except for certain types of business specified in the R3001 Agreement and the Supplement, e.g., residual market business and expanded market coverage business." Young Decl., Ex. 26 (EA Manual) at 6.

50. The EA Manual provides that an agent who does not become a registered representative of AFS "will be permitted to retain any FINRA licenses [obtained] prior to being appointed by the Company (provided you meet FINRA requirements) solely for the purpose of receiving trailing commissions (residuals) on business you produced for another company prior to your appointment," and that such an agent "may not place any further business (variable annuities, variable life, and mutual funds) or perform any service work for customers of the other company," and further provides in a footnote that all "appointments after 8/1/2000 must affiliate with Allstate Financial Services, LLC." *Id.* at 10.

51. The EA Manual also states that "[a]s an R3001 Agent, you may be involved in other business. However, you may not be involved (other than through a passive financial interest) in any insurance or other business in which insurance products or mutual funds are sold," that "[y]ou may not represent or solicit business for any other company, agent or broker, except as permitted by the Company," and that Allstate's position is that an agent "should not take part in any activities that might prove to place you or your agency in a conflict with respect to the duties you owe to Allstate." *Id.* at 22, 42, 44.

**D.     Allstate Provides Plaintiff with Various Benefits**

52. Allstate provides its new agents with an education bonus, a computer, a security key fob, and certain signs free of charge. *See* Young Decl., Ex. 24 (Pre Appointment Agreement) § III.A. ("Upon successful completion of the program and if appointed to sell the Company's products and services, Applicant shall receive an education bonus which averages $3,750.");

Young Decl., Ex. 27 (Redding Dep. Tr.) at 8:16–20, 73:9–12; Young Decl., Ex. 28 (Murphy Dep. Tr.) at 13: 6–9; Young Decl., Ex. 29 (7M Signage Invoice).

53. Allstate also gives agents an annual allowance to purchase technology. *See* Young Decl., Ex. 27 (Redding Dep. Tr.) at 35:15–17; Young Decl., Ex. 30 (ATA FAQ).

54. The allowance is initially paid as a one-time cash payment to new agency appointment's compensation in the month after appointment. *Id.*

55. This amount is pro-rated based on the month of the appointment—agents, like Plaintiff, who appoint in March, receive a ▮▮▮▮ cash payment. *Id.*

56. After the initial cash payment, established agents receive the allowance annually in February via a declining balance debit card, which they can use for technology purchases via the CDW Agency Technology Store, including for purchases of computers, monitors, printers, headsets and desk phones, and bank scanners. *Id.*

57. Unspent ATA rolls over each year so that it may accumulate and be used to refresh office technology on a regular basis. *Id.*

58. Plaintiff received an allowance of $1,400 on February 17, 2025. *See* Young Decl., Ex. 31 (Plaintiff's 2025 Allowance).

   **E.   Plaintiff Chooses to Purchase Various Items to Operate its Business**

59. After signing the Agreement with Allstate, Plaintiff ordered desk phones from CDW at the Agency Technology Store operated by CDW. *See* Young Decl., Ex. 32 (CDW Phone Order Confirmation); Young Decl., Ex. 30 (ATA FAQ); Young Decl., Ex. 27 (Redding Dep. Tr.) at 29.

60. Plaintiff paid CDW directly for the phones, and no portion of that payment went to Allstate. *See* Young Decl., Ex. 32 (CDW Phone Order Confirmation); Young Decl., Ex. 27 (Redding Dep. Tr.) at 21 (payment "entirely between the agent and CDW"), 27–28 (CDW

"get[ting] compensated for both the hardware as well as the installation services"; "none of that money" goes to Allstate), 62 (phone invoice payment "made by the agent").

61. Allstate does not require agents to purchase physical desk phones. *See* Young Decl., Ex. 27 (Redding Dep. Tr.) at 66-68.

62. An agent does not need a physical desk phone to operate the agency, and agents may instead use a "soft phone"—an application that runs on their computers and gives them a dial pad to make and place phone calls. *See* Young Decl., Ex. 27 (Redding Dep. Tr.) at 66–68.

63. After signing the Agreement with Allstate, Plaintiff also ordered an ***additional*** security key fob from CDW through the Agency Technology Store operated by CDW; Allstate provided Lukezic with his own security key fob free of charge. *See* Young Decl., Ex. 33 (CDW Security Key Order Confirmation); Young Decl., Ex. 27 (Redding Dep. Tr.) at 73 (explaining that the key fob on the invoice "would not have been for him" because "[t]he agent himself would have been provided one free of charge").

64. Plaintiff paid CDW directly for the additional key fob, and no portion of that payment went to Allstate. *See* Young Decl., Ex. 33 (CDW Security Key Order Confirmation); Young Decl., Ex. 27 (Redding Dep. Tr.) at 21, 27–28, 62.

65. Allstate does not require agents to purchase security key fobs—instead, it provides agents with access to a free two-factor authentication mobile app that serves the same purpose. Young Decl., Ex. 34 (Allstate_001562); Ex. 27 (Redding Dep. Tr.) at 17–19.

66. After signing the Agreement with Allstate, Plaintiff ordered monitors and docking stations from CDW through the Agency Technology Store and paid CDW directly. *See* Young Decl., Ex. 35 (CDW Monitors and Dockets Order Confirmation); Young Decl., Ex. 27 (Redding Dep. Tr.) at 21, 27–28, 62.

67. Allstate does not require agents to make these purchases— computer monitors are listed on the CDW Agency Technology Store "for agents to purchase for convenience," and that agents are free to "use any computer monitor from any source" instead. *See* Young Decl., Ex. 27 (Redding Dep. Tr.) at 20–21.

68. After signing the Agreement with Allstate, Plaintiff also chose to order post-it pads from Summit Group through the Allstate Business Builders website operated by Summit Group. *See* Young Decl., Ex. 36 (Summit Group Post-it Pads Invoice); Young Decl., Ex. 37 (Anderson Dep. Tr.) at 16:1–5; 17:4–15; 31:16–24.

69. Plaintiff paid Summit Group directly for the order. *See* Young Decl., Ex. 36 (Summit Group Post-it Pads Invoice); Young Decl., Ex. 37 (Anderson Dep. Tr.) at 49:1–4, 6–9.

70. After signing the Agreement with Allstate, Plaintiff ordered business cards from Chicago Envelope, a third party vendor through the Print on Demand platform. *See* Young Decl., Ex. 38 (Business Cards Invoice).

71. Instead of paying Chicago Envelope—the vendor that actually prints and ships the business cards—Plaintiff paid Allstate directly, and Allstate then transmitted the order details to Chicago Envelope, which printed and shipped the cards to Plaintiff and invoiced Allstate, not Plaintiff, for the production. *See* Young Decl., Ex. 37 (Anderson Dep. Tr.) at 58:1–3, 8–23.

72. Allstate routinely loses money in this pass-through arrangement because it charges agents an approximate conservative shipping estimate at checkout, which is smaller than the actual shipping charges. *See* Young Decl., Ex. 37 (Anderson Dep. Tr.) at 70:21–25, 71:1–7.

73. Business cards were also a voluntary purchase, not a requirement imposed by Allstate. Stevenson Decl., ¶ 8.

74. After signing an Agreement with Allstate, Plaintiff bought a sign from FastSigns. Young Decl., Ex. 39 (FastSigns Invoice); Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 257: 4-5. Lukezic ordered the sign because having a lobby sign is "good business practice." Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 256:24-25; 257: 1-5; *see also* Young Decl., Ex. 28 (Murphy Dep. Tr.) at 13: 6–9 (explaining signs are not a requirement).

### F. Allstate Confirms Plaintiff's Violations and Issues a Notice of Termination

75. Within a month of the Agreement's effective date, Allstate's Ivantage team alerted Allstate's Sales Leader Regine Napoleon that Lukezic represented himself as an independent agent and asked whether he maintains an independent partnership with "Old Slip Capital," because Ivantage could not move the Buglione book of business to Lukezic until those questions were resolved. *See* Young Decl., Ex. 40 (Allstate_006299-Allstate_006300).

76. Napoleon immediately contacted Lukezic to clarify the situation and reminded him that he is not permitted to carry any appointments with other companies unless appointed through Allstate, as "mentioned in [their] early onboarding discussions." *See* Young Decl., Ex. 41 (Allstate_078458-Allstate_078459). Napoleon noted that Plaintiff has appointments representing multiple carriers and asked Lukezic to sever them because he was an exclusive Allstate agent. *Id.* (Allstate_078458).

77. Lukezic responded that those insurance appointments were with annuity providers, which he writes through a separate business, and that he writes property and casualty insurance only through Allstate. *Id.*

78. Napoleon informed Lukezic that he could not write securities products with carriers and/or broker-dealers other than Allstate and its affiliates and asked him to confirm whether he would sever appointments held with carriers other than Allstate or its affiliates, whether in his name or in the name of his agency. *Id.* (Allstate_078455). She noted that failure to comply could

result in termination of his Agreement with Allstate because it would violate Plaintiff's contractual commitments. *Id.*

79. In response, Lukezic asked Napoleon to send his attorney, Adam Chodos, the contact name to Allstate's legal department. *Id.* (Allstate_078454).

80. While these communications with Lukezic were ongoing, Ms. Napoleon alerted Human Resources ("HR") and Allstate's Law and Regulation Department ("Law Department") about the potential violation of the Agreement—namely, that Plaintiff and Lukezic were maintaining appointments with unapproved third-party insurance carriers. *See* Laury Decl., ¶ 5.

81. As a result, HR and the Law Department opened an internal investigation, which ran from late March through June 2024. *See* Laury Decl., ¶¶ 6–7.

82. The investigation confirmed that Plaintiff and Lukezic held life and accident appointments with insurance carriers not approved by Allstate. *See* Laury Decl., ¶ 9.

83. The investigation also confirmed that Lukezic continued to operate BD and RIA businesses affiliated with Plaintiff even after executing the Agreement. *See* Laury Decl., ¶¶ 10–11.

84. These outside appointments and affiliated businesses enabled Lukezic to place insurance and securities products with carriers that Allstate did not approve. *See* Laury Decl., ¶ 12.

85. While the investigation was ongoing, communications between Allstate's employees, Lukezic, and his attorney continued. *See* Young Decl., Ex. 41 (Allstate_078453-Allstate_078459); Young Decl., Ex. 42 (Allstate_011290-Allstate_011291); Young Decl., Ex. 44 (Allstate_011277-Allstate_011289).

86. In those communications, Lukezic admitted that Plaintiff held outside appointments and that he continued to operate the affiliated businesses. *See* Young Decl., Ex. 42 (Allstate_011290).

87. On April 26, 2024, Lukezic sent an e-mail to Allstate's attorney David Mueller, stating that Old Slip had selling agreements with twenty insurance companies for life insurance in all fifty states, as well as ten selling agreements with annuity providers in all fifty states, unlike Allstate, which sells only two types of insurance and one type of annuity. *Id.*

88. Lukezic advised Allstate that he had no plans to divest his interests in those businesses. *See, e.g.*, Young Decl., Ex. 43 (Allstate_011585); Young Decl., Ex. 41 (Allstate_078453).

89. Lukezic told Allstate he had made it aware of the outside businesses, that he never said that he would relinquish them, and that throughout the process he was told that Allstate would be a vertical under what he described as his "independent agency," Plaintiff. *See* Young Decl., Ex. 41 (Allstate_078453).

90. He maintained that he was "under the impression that [he] was [an] independent agent contracted with Allstate as just another carrier under [his] agency." *See* Young Decl., Ex. 44 (Allstate_011278).

91. Lukezic claimed he had made clear to Allstate that he owned an RIA and BD business with selling agreements with other carriers and he identified four individuals as having knowledge of his outside activities: "Adrian Forman, Regine Napoleon, Brittany Cleere, and Jim Hoesttler [sic]." *See* Young Decl., Ex. 44 (Allstate_011277-Allstate_011278).

92. Allstate investigated Lukezic's allegations and determined that no one authorized Plaintiff or Lukezic to maintain outside insurer appointments, to sell insurance not approved by

Allstate, or to broker variable life and annuity products through non-Allstate affiliates, whether orally or in writing. Laury Decl., ¶¶ 14–15.

93. And all four individuals specifically denied knowing about Lukezic's plans to carry on outside activities. Laury Decl., ¶ 15.

94. The Business Plan Lukezic prepared during onboarding likewise omitted any reference to his supposed plans. *See* Young Decl., Ex. 11 (Lukezic's Business Plan).

95. Allstate informed Lukezic that it had investigated his claim that Allstate employees were aware of his outside activities and had determined that all the identified individuals denied knowing about his plans to maintain an outside business and broker securities products outside his Allstate relationship. *See* Young Decl., Ex. 44 (Allstate_011277– Allstate_011278).

96. Based on these findings, the Law Department advised HR that Plaintiff's active outside appointments and continued operation of competing businesses were inconsistent with the Agreement and incorporated materials. Laury Decl., ¶ 13.

97. Allstate sent multiple letters and emails over several months to Lukezic and his attorney, requesting that he comply with his contractual commitments as Allstate's exclusive agent, sever appointments with other insurance carriers, and cease financial services activities outside of AFS. *See* Young Decl., Ex. 45 (April 16, 2024 Letter); Young Decl., Ex. 46 (April 26, 2024 Letter).

98. Lukezic refused Allstate's request. Laury Decl., ¶ 19.

99. Allstate's HR Department formally recommended termination of Plaintiff's Agreement based on the investigation's findings that Plaintiff's active outside appointments, its offering and selling of insurance and securities products not approved by Allstate, and its continued

operation of competing outside businesses violated the Exclusive Agency Agreement and based on Lukezic's refusal to cure those violations. Laury Decl., ¶¶ 19–20.

100. On June 25, 2024, Allstate sent a Notice of Termination stating that the Agreement would terminate in ninety (90) days pursuant to the Agreement's "with or without" cause provision. *See* Laury Decl., Ex. C (Notice of Termination).

101. The Notice stated that Plaintiff "may have the option of accepting a termination payment from Allstate or selling the economic interest to an approved buyer as outlined in the Supplement for the R3001C Agreement." *Id.*

102. Even though Plaintiff previously claimed that it could not be compensated by money damages if Allstate terminated the Agreement, it identified "computable" damages in discovery, including rent, employee salaries, principal and interest owed to creditors, business expenses, and attorneys' fees. *See* Young Decl., Ex. 17 (Plaintiff's Initial Disclosures).

103. Plaintiff also identified damages it could only estimate, such as the loss of a twenty-year revenue stream, lost opportunities to cross-sell insurance products, lost ability to acquire additional agencies, and reputational harm. *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 272:10-278:19.

### G. Lukezic's Low Opinion of Allstate and AFS Employees

104. Lukezic described Sales Market Leader Regine Napoleon as knowing "little to nothing about FINRA licenses and AFS," and stated that her subordinate, Adrian Foreman, "knows even less" and was "relatively clueless." *See* Young Decl., Ex. 1 (Lukezic Dep. Tr.) at 123:14–19.

105. Lukezic further described Napoleon as "not qualified" for her position, stated that she has a "very low IQ," "little to no knowledge of P&C," "the core business at Allstate," and even less knowledge of "FINRA licensing," and described both Napoleon and Paiva as "novices when it comes to finance and legal issues." *Id.* at 139:17–22; 150:13–17; 196:12–20; 197:10–19.

106. Lukezic described Kendall Paiva, Adrian Foreman, and Regine Napoleon as having "no idea what was going on with . . . any sort of FINRA licensing or . . . AFS in general." *Id.* 139:17–22.

107. With respect to AFS representative Vinny Ferrara, Lukezic described him as "a character out of Goodfellas" with a very thick "Italian accent from Brooklyn," and as "a little less than professional," without capabilities to make decisions for Allstate or AFS, stating, "I don't think it was Vinny . . . because Vinny . . . don't have the capability of making that decision." *Id.* at 128:1–8; 145:11–20.

Dated: January 20, 2026

    Respectfully submitted,

    **TROUTMAN PEPPER LOCKE LLP**

    By: */s/ A. Christopher Young*
    A. Christopher Young
    Erica H. Dressler (admitted *pro hac vice*)
    Milica Krnjaja (admitted *pro hac vice*)
    215.981.4190
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, PA 19103
    christopher.young@troutman.com
    erica.dressler@troutman.com
    millie.krnjaja@troutman.com

    Sophia N. Dauria
    875 3rd Ave
    New York, NY 10022
    212.704.6185
    Sophia.dauria@troutman.com

    *Attorneys for Defendants Allstate Insurance Company and Allstate Financial Services, LLC*