**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC, | CASE NO: 7:25-cv-01110-JGLC |
| Plaintiff, | |
| v. | **PLAINTIFF'S RULE 56.1 STATEMENT OF MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE NEW YORK FRANCHISE SALES ACT CLAIM** |
| ALLSTATE INSURANCE COMPANY, ALLSTATE FINANCIAL SERVICES, LLC | |
| Defendants. | |

Pursuant to Federal Rule of Civil Procedure 56, Local Rule 56.1, and the Court's Individual Rule 4(f), the following are additional statements of material fact as to which Plaintiff contends there is no genuine issue to be tried.[1]

22.     James "(Lukezic")" is the owner and managing director of Plaintiff Old Slip Benefits & Insurance Services, LLC ("Old Slip"), a New York limited liability company. *See* Declaration of James Lukezic In Support of Plaintiff's Motion for Partial Summary Judgment ("Lukezic Decl.") ¶ 1.

**Nature of the Relationship**

23.     Under the terms of the Allstate Agency Agreement, between Allstate Insurance Company ("Allstate") and Old Slip, Old Slip was given authority to solicit, offer and sell Allstate insurance.  (App Tab 1, ¶¶ II(A), V[C]).  Old Slip is required to provide customer service to its agency's policy holders and assist in claims administration for its policy holders.  (App Tab 1, ¶¶ II(A), V[B]).  Old Slip must operate the business, using the Allstate brand name, in accordance

---

[1] The numbering of the statements here starts at number 22 because this Statement of Material Facts continues the numbering from the separately filed Statement of Material Facts (Agreed), which contains 21 statements, filed simultaneously with this Statement of Material Facts.

with Allstate's rules and procedures, under a system prescribed in substantial part by Allstate Insurance Company. (App Tab 1, ¶¶ I[C], V, XXI[D]). Old Slip must find the location and hire and pay for the staff.  (App Tab 1, III[B], V(B)). Old Slip must meet business objectives established by Allstate in the areas of profitability, growth, retention, customer satisfaction and customer services, build and maintain a profitable book of business, and assist Allstate in its efforts to achieve market penetration. (App Tab 1, ¶II(A),(B)). Lukezic Decl. ¶ 2; Allstate Agency Agreement, **Appendix, Tab 1**  (Master Exhibit 33).

24.    Under the terms of the Allstate Agency Agreement, between Allstate and Old Slip, Old Slip was granted the right to engage in the business of offering Allstate insurance policies, provide customer service to Allstate policy holders, and provide assistance to Allstate policy holders in claims administration in accordance with Allstate's rules and procedures, under a system prescribed in substantial part by Allstate Insurance company. Allstate Agency Agreement, **Appendix, Tab 1** (Master Exhibit 33)

25.    As a condition for entering into the agency agreement, and after executing the Allstate agency agreement, as a condition of continuing to operate the Allstate insurance agency, Old Slip has been required to make several different types of "payments", including payments directly to Allstate and to third parties including third party suppliers, which directly and indirectly benefit Allstate.   Lukezic Decl. ¶ 9.

26.    Lukezic first had contact with Allstate in the summer of 2023 when he was researching purchasing a franchise business opportunity for a property and casualty insurance agency.  His idea was to cross-sell the property and casualty insurance to individuals who were plan participants in the retirement plans which he (through his retirement advisory business Old Slip Registered Investment Advisors LLC) help to advise for several large companies.  He filled

out some online interest forms, and then was contacted by an Allstate insurance agency salesperson James Hoffsher.  *Id.* at ¶ 10.

27.    Allstate's online advertising emphasized that, as an Allstate agency owner, Lukezic would be the owner of the business, and Allstate would provide support every step of the way.  In its website and marketing brochure, Allstate stated that, as an agency owner, the agency would be "Nobody's business but yours" (App Tab 2 at 1);  "Allstate supports you every step of the way" (App Tab 2 at 2); "You also have the opportunity to pass it on to your children or another family member" (App Tab 3 at 5); "For over 85 years, Allstate Agency Owners have had this respected brand behind them every step of the way" (App Tab 3 at 5); and "When you become an Allstate Agency Owner, you're not on your own.  From day one, we will help you build the knowledge, skills and tools you need to succeed." (App Tab 3 at 9).  The Brochure list three requirements for opening:  "Secure financing"; "Set up office and hire staff", and "Prepare marketing and grand opening materials."  (App Tab 3, at 11).  The Intake Form  states that as an agency owner you will have "No franchise fees however capital investment is required to help operate your business" (App Tab 2 at 7, Old Slip 0000886).  A copy of Allstate's website pages, marked as Bates Numbers[2] Old Slip 0000880-0000885, and the Intake Form marked as Bates Number Old Slip 0000886,  are attached in **Appendix Tab 2**, and the Allstate Agency Ownership Brochure, marked as Bates Number Old Slip 0000856 - 0000867 is attached in **Appendix Tab 3**; Lukezic Decl. ¶ 11.

28.    Allstate has also been an exhibitor at several franchise shows, where franchise companies have booths exhibiting their franchise opportunities, including, for example, the

---

[2] References to the Bates Number refer to the numbering assigned in the document production, referenced here to assist in identifying the document.

franchise exposition at the Meadowlands Expo Center. A copy of a press release for that show, titled "Take Control of Your Future at The Franchise Show", is attached as **Appendix Tab 4**; Lukezic Decl. ¶ 11.

29.    When Lukezic spoke with Allstate's salesperson James Hoffsher in 2023, Lukezic told him about his plans and that he was interested in having an agency in New York. Hoffsher told Lukezic that Allstate had several agency opportunities available, and then, after passing an online assessment, Hoffsher put Lukezic in touch with another Allstate salesperson, Brittany Cleere. Brittany Cleere then put him in touch with the New York area Allstate salesperson Regine Napoleon. Regine Napoleon told him that she had two agencies in Westchester County, New York that were looking to sell their agencies. After she talked with them to confirm they were interested, she called Lukezic and said they were interested in speaking with him. She explained that both of them had been negatively affected by Covid and were looking to retire and sell their agencies. Antohny Fava ("Fava") had been negatively affected by flooding in his Mamaroneck office and had already moved to Florida and was operating remotely from there. Al Buglione ("Buglione") had lost a number of employees due to Covid and was also operating virtually from home. She told Lukezic that the standard purchase price is two times the annual net revenue, but that he might be able to purchase these agencies for less because both agency owners were highly motivated to sell. This information helped guide Lukezic in his negotiations with them. Lukezic Decl. ¶ 12.

30.    During Lukezic's discussions with Fava and Buglione, Regine Napoleon was constantly kept in the loop by all sides. Napoloeon told Lukezic that he was required to purchase all of the technology equipment, including computers, printers, scanners, and phone systems, that were used in the operation of the sellers' agencies, because the equipment "goes with the book" of business. As a result of this requirement, Old Slip had to purchase, and did purchase, the sellers'

equipment, as reflected in the asset purchase agreements, and part of the purchase price which Old Slip paid was for this equipment. Allstate had to review and approve the asset purchase agreements which he signed with each seller. Lukezic ended up negotiating a price of $267,000 for Fava's agency for the purchase of his business assets including the annuity stream from his book of business and his office equipment. A copy of the signed Asset Purchase Agreement with Fava is attached in **Appendix Tab 5** (Bates Numbers Old Slip 0001505 – 0001534). Lukezic ended up negotiating a price of $350,000 for Buglione's agency for the purchase of his business assets including the annuity stream from his book of business and his office equipment. A copy of the signed Asset Purchase Agreement with Buglione is attached in **Appendix Tab 6** (Master Exhibit 30**).** Lukezic Decl. ¶ 13.

31.     Under the terms of the Allstate agency agreement, Old Slip is obligated to give the bulk of the agency revenue to Allstate. Currently, Allstate receives ██% of Old Slip's customer premium payments, and Old Slip only receives ██ percent of the customer premium payments. From the payment of the ██ percent, Allstate first deducts the loan payments to Wintrust subsidiary Lake Forest Bank, Fava, and Buglione. Lukezic Decl. ¶ 14.

32.     As a condition for purchasing the Allstate agency, Lukezic was required to open a business bank account at one of the two Allstate authorized banks, namely Chase or Wells Fargo, and to purchase the stamp that was required to use if customers accidently delivered a premium check to Old Slip (rather than to Allstate), in which case Lukezic was required to use the stamp to endorse the check over to an Allstate controlled bank account. Lukezic Decl. ¶ 15.

33.     Under Allstate's required procedures, as outlined in the New Agent Guide included in **Appendix Tab 37** (Master Exhibit 59), and Mobile Deposit Instructions in **Appendix Tab 8** (Master Exhibit 64), if a customer mistakenly makes a premium payment to the agency owner,

Lukezic is required to endorse the check and deposit it into Allstate's Allstate-owned deposit account at Wells Fargo or Bank of America. Lukezic Decl. ¶ 16.

34.     With regard to the office location, as a condition for purchasing the Allstate agency, Lukezic was required to, and did, locate the office at a location which had to be approved by Allstate.  In fact, Allstate disapproved the first two locations that were proposed,  and only approved the third location. Lukezic Decl. ¶ 19.

**Agency Agreement Standards**

35.     By signing the Agency Agreement, the agency becomes obligated to abide by the obligations and requirements outlined in the Agency Standards, which are incorporated into the Agency Agreement. Allstate Agency Agreement, **Appendix, Tab 1** (Master Exhibit 33)**;** Agency Standards, **Appendix, Tab 40**.  Lukezic Decl ¶ 3.

36.     The Agency Standards which are incorporated into the Agency Agreement, outline mandated policies, procedures, and requirements agencies are contractually obligated follow in the operation of the agency,  including among other things, technical requirements for agency technology and minimum specifications, staffing procedures and requirements, procedures and requirements for dealing with customers and prospective customers, marketing and advertising standards,  procedures  and  requirements,  new  customer  processing  procedures,  claims administration procedures. Agency Standards, **Appendix, Tab 40**.

37.     Technology Requirements. The Agency Standards, which are incorporated into the Agency Agreement, specify the mandated minimum technology requirements to operate the agency. Agency Standards, **Appendix, Tab 40** at page 10.

38.     Staff. The Agency Standards, which are incorporate into the Agency Agreement, specify the mandated the requirements for the training and licensing of agency staff. Agency

Standards, **Appendix, Tab 40** at pages 10-11.

39.    Customer and Prospective Customer Contact Rules and Regulations. The Agency Standards, which are incorporated into the Agency Agreement, specify the mandated rules and procedures for all telephone calls, texts, faxing, email and direct mail communications with customers and prospective customers.  Agency Standards, **Appendix, Tab 40** at pages 11 -15.

40.    Marketing and Advertising. The Agency Standards, which are incorporated into the Agency Agreement, mandate that agencies must use only approved Allstate marketing and advertising business, and contain specific requirements for each form of advertising including directory listings, websites, digital advertisements, and social media. Agency Standards, **Appendix, Tab 40** at pages 15-18, 26.

41.    Procedures for Writing New Business. The Agency Standards, which are incorporated into the Agency Agreement, specify the mandated procedures which agencies must follow for writing new business, including ordering consumer reports, obtaining and transmitting information to develop an accurate quote, accepting payments from any policy holders  (Pages 18-19), and require the agency to accept "accept payments from any and all company policyholders." Agency Standards, **Appendix, Tab 40** at page 19.

42.    Claims Processing and Vendor Promotion. The Agency Standards, which are incorporated into the Agency Agreement, mandate that agencies must "assist in claims administration in accordance with the Company's rules and procedures" (Page 20), and specify mandated procedures agencies must following in claims administration, including promoting certain vendors including a third party repair service (Good Hands), a windshield repair service (Safelight), and a rental car service (Enterprise). Agency Standards, **Appendix, Tab 40** at page 20.

43.    Intake of New Customers, Collecting First Premium Payment, and Delivery of Policies. The Agency Standards, which are incorporated into the Agency Agreement, mandate that agencies must follow Allstate's procedures for the intake of new customers, and require agencies to do the following, among other things:  a) request and record all the required information on the required forms, b) obtain the customer's signatures, c) collect the first premium payment, d) submit all the completed forms and payments to Allstate, e) recommend life insurance products that are in the best interest of the consumer, and f) hand deliver and review the policies with the customer. Agency Standards, **Appendix, Tab 40** at pages 21-25.

44.    When the agency signs the Agency Agreement, the Agency also becomes obligated to abide by the requirements and obligations set forth in the Supplement, which is incorporated into the Agency Agreement.  Allstate Agency Agreement, **Appendix, Tab 1** (Master Exhibit 33)**;** Supplement to Agency Agreement, **Appendix, Tab 41**.  Lukezic Decl ¶ 5.

45.    The Supplement specifies that it is an agency's role to sell, solicit and service Allstate insurance. Supplement to Agency Agreement, **Appendix, Tab 41** at page 6.

46.    The Supplement mandates that agencies must purchase, maintain, repair and update "███████████████████████████████████████████████████████████████ ███████████████████████████████████████", which "████████████ ███████████████████████████████████████████████████", and must use the Allstate portal and Allstate provided software, for conducting Allstate business. Supplement to Agency Agreement, **Appendix, Tab 41** at pages 28 – 29.

47.    The Supplement mandates that agencies must pay Allstate for the cost of the computer support provided by Allstate for the computer equipment. ("█████████████████ ███████████████████████████████████████████

8

████████████████████████████████████████████████████████████ ”).

Supplement to Agency Agreement, **Appendix, Tab 41** at page 28.

48.    The Allstate Insurance Company's Exclusive Independent Contractor Manual ("Manual") dated October 25, 2022, a copy of which is included in **Appendix Tab 19** (Master Exhibit 20), and which is incorporated into the Agency Agreement, sets forth a long list of the rules and requirements relating to the operation of the Allstate Agency. Lukezic Decl ¶ 4.

49.    During the months of December 2023 to February  2024, before Old Slip entered into the Agency Agreement, Lukezic was required to attend, and did attend, many days of online courses covering every aspect of the operation of the Allstate Agency.  A copy of the Course Category List is attached to the Appendix as **Appendix Tab 42.**  A copy of the Assessment Course Category is attached to the Appendix as **Appendix Tab 43**.  A copy of the New Agency Owner Education Experience is attached to the Appendix as **Appendix Tab 44**.  Lukezic Decl ¶ 6.

50.    During the operation of the Agency, Lukezic would do cold calling to get new customers and build the book of business.  Lukezic would talk to new and existing policy holders about their options and the amounts and types of coverage.  Old Slip's staff person Denise would help new customers fill out the necessary forms, get the first premium check from them, and forward the forms and the first premium check to Allstate, and provide assistance with claims administration. Lukezic Decl. ¶ 8.

**Office Technology Equipment**

51.    Under Allstate's rules and requirements, as a condition for entering into the Allstate agency agreement, and for Lukezic to continue to operate the Allstate agency, Lukezic is required to purchase and use Allstate's approved office technology equipment, including the Allstate approved laptop computers, printer, scanner, phones, and fob security devices, from its designated

suppliers, namely CDW, which have been set up for the Allstate system and which have the required Allstate software and configurations.  Lukezic cannot purchase such equipment from anywhere, because it would not work on Allstate's systems.  Lukezic Decl. ¶ 20; **Appendix Tab 13, 14** (Master Exhibits 106 and 107); **Appendix Tab 16**, Redding Deposition Transcript, Pages 8:1-3; 9:14-24; 10:1-23; 15:7-24; 16:1-9; 17:1-24.

52.     New Allstate agents, like Lukezic, were required to, and Lukezic did, order and pay for their computer equipment before their start date. **Appendix Tab 16**, Redding Deposition Transcript 43:12-23.

53.     Technology needs and requirements are determined by the Allstate Agency Technology Team and in collaboration with Allstate Hardware Team. **Appendix Tab 16**, Redding Deposition Transcript 41:21-24, 42:1-12.

54.     Lukezic purchased some of the required equipment from the Sellers (Fava and Buglione), and purchased some of the required equipment from Allstate's required source, by going to the Allstate Technology Store platform and purchasing it from Allstate's designated seller. Lukezic Decl. ¶ 21.

55.     According to Allstate, all of the equipment which he paid for did not actually belong to him.  When Allstate told Lukezic that he was going to be terminated, Allstate told him that all of the equipment which was used in the operation of the business, including the computers, monitors, scanners, printers, phone system, and security fobs which he had purchased, was actually the property of Allstate Insurance Company, because this equipment "goes with the book" of business, and Allstate demanded that he "return" the property to Allstate. *Id.* at ¶ 22.

56.     Specifically, in March 2024, when he had a Zoom call with Regine Napoleon, when she called to warn him that Allstate was going to terminate the agreement, she said that regardless

of what he said, the termination was happening, and that Lukezic had to "return" all of the Allstate property that was used in the business, including the laptops, monitors, scanner, printers, and phone system, and any marketing material that had the Allstate logo.  And in June 2024, when Lukezic had a Zoom call with Allison McMahone and Regine Napoleon, when they informed him of the termination, Allison said that he had to return all of Allstate's property, including the computer, phones, printer and scanner. *Id.* at ¶ 23.

57.    Lukezic paid for the equipment which he purchased from the Sellers.  Specifically, included in the purchase price which Lukezic paid to Buglione, he paid for Buglione's authorized Allstate equipment, including about 8 or 9 Allstate authorized computers, 4 Allstate authorized printers, 4 Allstate authorized scanners, and his Allstate authorized phone equipment, all of which had already been configured to operate on Allstate's systems. *Id.* at ¶ 24.

58.    Included in the purchase price paid to Fava, Lukezic purchased 2 or 3 Allstate authorized computers, 2 Allstate authorized printers, and 2 Allstate authorized scanners, and one piece of Allstate authorized phone equipment. *Id.* at ¶ 25.

59.    In setting up the office, Lukezic communicated with Allstate's information technology team about his equipment and technology requirements, and they told him the additional equipment that needed to be purchased, and they helped set up the systems.  Specifically, they told him that he needed to order additional docking stations, monitors, phone equipment, and an additional security fob, which he did.  *Id.* at ¶ 26.

60.    The technology allowance provided by Allstate, which was about $3,000, given to him as an electronic gift card credit, did not cover the cost of the additional equipment which was required to be purchased.  Most of the allowance was used up on the laptop computer which he was required to purchase and did purchase during the training.  The remaining amount of the

11

allowance did not cover the cost of the additional equipment which he had to purchase, and obviously did not cover the cost of the equipment which he purchased from Fava and Buglione, which was included in the purchase price for their agencies.  Lukezic Decl. ¶ 29.

61.    In February 2024, at Allstate's direction, Lukezic purchased two docking stations and four monitors, for a purchase price of $▊▊▊▊.  Lukezic purchased them by going to the Allstate Technology Store platform, and placing the order with the Allstate's designated supplier. A copy of the Order information is included in **Appendix Tab 9** (Master Exhibit 118); Lukezic Decl. ¶ 30.

62.    In February 2024, at the direction of Allstate, Lukezic purchased two pieces of bundled Avaya phone equipment for $▊▊▊▊.  He purchased this phone equipment by going to the Allstate Technology Store platform, and placing the order with Allstate's designated supplier. A copy of the Order information is attached in **Appendix Tab 10** (Master Exhibit 115); Lukezic Decl. ¶ 31.

63.    In April 2024, Lukezic purchased a security fob device from the Allstate Technology Store, for $▊▊▊.  A copy of the order information is attached in **Appendix Tab 11** (Master Exhibit 117); Lukezic Decl. ¶ 32.

64.    Allstate required Lukezic to purchase all of the computer and phone equipment from its exclusive supplier CDW on its Allstate Technology Store Platform, as indicated in several of Allstate's new agent guidelines and emails, including Pre-Appointment New Agent Checklist, **Appendix Tab 12** (Master Exhibit 41); the New Agent Guide, **Appendix Tab 13** (Master Exhibit 106); Email dated February 20, 2024, **Appendix Tab 14** (Master Exhibit 107); Email dated February 22, 2024, **Appendix Tab 15** (Master Exhibit 111); Redding Deposition Testimony, **Appendix Tab 16**, at 8:1-3, 9:14-24, 10:1-23; Lukezic Decl. ¶ 33.

65.    The prices that Lukezic paid for the docking stations, monitors, phone equipment and fob device from the Allstate Technology Store were well above full retail price.  He could have purchased the same or similar equipment from a large retailer like Best Buy for a much cheaper price. Lukezic Decl. ¶ 34.

66.    To the extent that Allstate claims that these were discounted prices, then Allstate itself benefitted from the arrangement. According to Allstate's deposition testimony, Allstate obtains discounted pricing from the supplier CDW for Allstate's own internal corporate needs by committing to CDW that all of its 10,000 agents will purchase all of their electronic equipment from CDW.  Redding Deposition Testimony, **Appendix Tab 16**, at pages 11, 12, 16, 28, 56; Lukezic Decl. ¶ 35.

67.    Specifically, Allstate has an arrangement with CDW to provide computers and accessories to Allstate and its agents at a specified ▮ percent markup over the purchase price which CDW pays to the manufacturer. Redding Deposition Testimony, **Appendix Tab 16**, 11:17-24, 12:1-23.

68.    Since Lukezic became an Allstate agent, Allstate has not given him any additional annual technology allowance.  Lukezic Decl. ¶ 36.

69.    Last year, Allstate announced that it was using a new security fob system, and it required all agents including Lukezic to go to CDW and purchase new fobs, which he did, as required by Allstate.  Allstate later changed its mind, after the new security system did not work, and told agents that they had to switch back to the old fobs.  Lukezic Decl. ¶ 37.

70.    As mentioned above, when Allstate told him that he was going to be terminated, Allstate claimed that all of the equipment that was used in the operation of the business, including the laptops, printers, scanners, phones, and fob security devices, were Allstate's property, even

though Lukezic had paid for them, and Allstate demanded that he "return" all of this property to Allstate. Lukezic Decl. ¶ 38.

**Stationery**

71.    As part of the requirements to be an Allstate agent, Allstate required Lukezic to purchase customized business cards for the agency directly from Allstate, which he did.  Lukezic Decl. ¶ 39; **Appendix Tab 24**, Anderson Deposition Transcript, 21:20-21; 25:12-16; 28:18-22, 43:24-25; 44:1; 51:20-25.

72.    Allstate made it clear to him that he was required to purchase business cards in his conversations with the onboarding team, as well as in Allstate's new agent checklist, Allstate's guidelines, and emails. Lukezic Decl. ¶ 40.

73.    Allstate's Pre-Appointment New Agent Checklist, which Allstate sent in three separate emails in February 2024, listed one of the required items on the Pre-Appointment New Agent Checklist that he must order business cards.  The Checklist includes the following as a required item: "Business Cards.  Order business cards for staff, letterhead, envelopes, brochures." A copy of the emails and attached Checklist sent in February are included in **Appendix Tab 12** (Master Exhibit 41), **Appendix Tab 17** (Master Exhibit 42); **Appendix Tab 18** (Master Exhibit 43); Lukezic Decl. ¶ 41.

74.    The Questions and Answers issued by Allstate in March 2000 explaining its new business model for Allstate agents, states that:

Q18:  Should an agent discard his/her current stock of business cards and re-order new with the updated Allstate logo?

A:  No.  Agents should deplete their current stock of business cards and reorder when necessary." Allstate Questions and Answer, **Appendix Tab 20** (Master Exhibit 54, at 4);

Lukezic Decl. ¶ 43.

75.    The business cards which they provided were on cheap paper one-sided, with black lettering only except for the Allstate logo in blue.The price which Lukezic paid Allstate for the business cards was well above full retail price.  Lukezic could have ordered higher quality cards, and a higher number of cards, from other suppliers, such as Vista Print, for a much lower price. Lukezic Decl. ¶ 46.

76.    After Allstate receives the money from agents for stationery items including business cards, the printer invoices Allstate for the cost of the items, and that, if Allstate pays the invoice within 20 days, Allstate receives a ■■ percent discount from the printer, and that Allstate does not refund this credit to the agents.  Anderson Deposition Testimony, **Appendix Tab 24**, at pages 75:18-22; 81:1-5. Chicago Envelope Agreement Schedule, **Appendix Tab 25** (Master Exhibit 53); Lukezic Decl. ¶ 47.

77.    On average, the average size of the invoices that Allstate receives each week from Chicago Envelope is about $■■■. Anderson Deposition Testimony, **Appendix Tab 24**, at 80:5-18.

78.    One of the benefits of the agreement for Chicago Envelope is that Allstate is committing that they are going to order their business cards, letterhead, and stationary from Chicago Envelope. Anderson Deposition Testimony, **Appendix Tab 24**, at 83:20-25, 84:3.

79.    In return from Allstate's commitment to order business cards, letterhead and stationery from Chicago Envelope, Chicago Envelope provides discounted pricing to Allstate for products ordered by the agents and well as products ordered by Allstate for their internal use. Anderson Deposition Testimony, **Appendix Tab 24**, at 84:5-12.

80.    Of the types of orders that agents place for products made by Chicago Envelope,

15

business cards are the most common category. Anderson Deposition Testimony, **Appendix Tab 24,** at 68:20-25.

81.     Generally, at least 50% of the orders to Chicago Envelope are for Allstate's internal use, while orders from agents are about 50%.  Anderson Deposition Testimony, **Appendix Tab 24,** 34:3-17; 66:7-16.

82.     The Agreement between Chicago Envelope and Allstate contains a pricing schedule that Allstate uses to determine the price to charge for products provided by Chicago Envelope including business cards and envelopes. Chicago Envelope Agreement Schedule, **Appendix Tab 25**; Anderson Deposition Testimony, **Appendix Tab 24,** at 61:10-23; 63:15-25.

83.     Allstate agents are required to purchase basic notepads from the Allstate Print on Demand Portal.  Anderson Deposition Testimony, **Appendix Tab 24,** 22:4-12; 25:12-16.

**Signs**

84.     As an Allstate agent, Plaintiff was required to obtain the initial external sign for the agency from Allstate by providing Allstate with the required information, which Allstate forwarded to the vendor which Allstate selected, named SevenM, to fabricate and install Plaintiff's external sign.  Murphy Deposition Testimony, **Appendix Tab 27,** at 26:17-25, 27:1:13, 70:10-13.

85.     Although Allstate paid for the initial exterior sign, Allstate did not pay for Lukezic's interior sign, which he had to purchase with his own money, for $205.92.  A copy of the Invoice is included in **Appendix Tab 26**  (Old Slip 0003864); Lukezic Decl. ¶ 49.

86.     In addition, under the agreement with Allstate, if the agency closes within two years, then Allstate can chargeback to Lukezic the prorated costs of the initial exterior sign, so he could end up paying for the exterior sign.  Manual, **Appendix Tab 19**  (Master Exhibit 20, at Page 19); Murphy Deposition Testimony, **Appendix Tab 27,** at pages 49-50; Lukezic Decl. ¶ 50.

87.     Under the terms of the agreement with Allstate, if Lukezic ever relocates the office, he is required to pay for a new sign and purchase it from Allstate's designated supplier.  Manual, **Appendix Tab 19** (Master Exhibit 20, at 14); Murphy Deposition Testimony, **Appendix Tab 27**, at pages 37-39, 46; Lukezic Decl. ¶ 51.

88.     Allstate benefits from its "preferred vendor" relationship with the sign suppliers, because Allstate claims it has obtained discounted pricing because of the commitment that all of its 10,000 agents will purchase their signs from the supplier, and this arrangement allows Allstate to purchase signs for its own internal corporate purposes for the same discounted volume pricing. Murphy Deposition Testimony, **Appendix Tab 27**, at pages 28, 43-44; Lukezic Decl. ¶ 52.

89.     Philadelphia Sign Company was one of Allstate's preferred vendors for signs in 2024.  Allstate's agreement with Philadelphia Sign Company provided for discounted volume discounts.  Murphy Deposition Testimony, **Appendix Tab 27**, at  42:24-25, 43:1-19.  Allstate also uses Philadelphia Sign Company as its supplier for its own company signage, which it purchases for the same discounted volume pricing. Murphy Deposition Testimony, **Appendix Tab 27**, at 43:21-25, 44:1-25.

**Loan Fees**

90.     Allstate has a program to assist new agents, who are purchasing a retiring or selling agent's book of business, to obtain financing to purchase the book, which it calls the Allstate Lending Connection. Comm Deposition Testimony, **Appendix Tab 29**, at 11:3-5, 16:9-24, 17:1-4.

91.     In Lukezic's discussions with the Allstate salespersons including James Hoffsher, Allstate said that Lukezic should get financing for the purchase from Wintrust Bank, and Allstate referred him to the bank by giving him the bank's contact information.  A copy of the email with

Allstate salesperson James Hoffsher dated September 12, 2023 confirming the introduction to Wintrust Bank is attached in **Appendix Tab 28** (Master Exhibit 7); Lukezic Decl. ¶ 53.

92.     As directed by Allstate, Lukezic did in fact use Wintrust Bank (one of its subsidiaries Lake Forest Bank to finance the purchase of the Allstate agency; Lukezic Decl. ¶ 54.

93.     Under an arrangement which Allstate calls the "Allstate Lending Connection" program, Allstate derives additional revenue and fees from him and the lender.  Allstate provides the bank with forms required for it to take a security interest in Lukezic's agency's expected revenue stream, Allstate agrees to make the lender's loan payments directly from the revenue stream by deducting it from Lukezic's portion of the customer premiums, the lender agrees to give Allstate a kickback in the amount of one percent of Lukezic's loan amount, and both Lukezic and the bank are required to pay "processing fees" to Allstate.  Comm Deposition Testimony, **Appendix Tab 29**, at pages 51:1-5, 19-24, 52:24, 53:1-14, 55:9-24, 56:1-2, 61:14-24, 62:1-24, 63:1; Lukezic Decl. ¶ 56.

94.     This secret ███ percent kickback, which Lake Forest paid to Allstate in connection with Lukezic's loan, was kept **_hidden_** from him, and it was **_never_** disclosed to Lukezic by Allstate or the bank.  Lukezic only found out about this kickback in the discovery process in this litigation when Allstate's witness, Mr. Comm, disclosed this kickback, and from the Preferred Provider Marketing and Loan Origination Agreement between Allstate and Wintrust Bank which Allstate produced shortly before the deposition. Lukezic Decl. ¶ 57.

95.     Allstate receives revenue from its arrangement with Wintrust Bank by charging the lender a fee of at least ██████% percent of the loan amount, and charging the agent a processing fee which is added to the loan.  Preferred Provider Marketing and Loan Origination Agreement, **Appendix Tab 30**, (Master Exhibit 57, at pages 5-6); Comm Deposition Testimony, **Appendix**

**Tab 29**, at pages 36:22-24, 37:1, 58:3-5, 63-72; Lukezic Decl. ¶ 58.

96.     As part of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, marked as Master Exhibit 57,  and Allstate's commitment to refer all prospective new agents to Wintrust, Wintrust agreed to pay Allstate a one-time initial fee of $████████.  **Appendix Tab 30**, at 5; Comm Deposition Testimony, Appendix Tab 29, at 31:19-24, 32:1-9; Lukezic Decl. ¶ 59.

97.     As part of the Preferred Provider Marketing and Loan origination Agreement with Wintrust, Wintrust agreed to pay Allstate an annual origination fee of ████████% (depending on the volume of new agency term loans) of the net new agency term loan volume for the loans placed by Wintrust to agency owners. **Appendix Tab 30** (Master Exhibit 57, at pages 5-6); Comm Deposition Testimony, **Appendix Tab 29**, at pages 36:22-24, 37:1, 58:3-5; Lukezic Decl. ¶ 60.

98.     The typical Allstate insurance agency book of business is very expensive, and costs hundreds of thousands of dollars, so it is not practical or realistic for agents to pay for it in a cash lump sum, and so new agents are effectively required to obtain financing. Comm Deposition Testimony, **Appendix Tab 29**, at page 39:2-13; Lukezic Decl. ¶ 61.   That is exactly why, in Allstate's own advertising, it states as one of the key requirements to "Get started now!", a prospective agency owner must: "Secure financing." (**Appendix Tab 3**, at 11).

99.     In addition, new agents like Lukezic cannot just go out and get any lender to finance the purchase of an Allstate insurance agency because lenders are not familiar with the Allstate agency model or the idea of taking a security interest in the commission stream as collateral for the loan.  Lukezic Deposition Testimony, **Appendix Tab 31**, at page 98:13-21; Lukezic Decl. ¶ 62.

100.    As a result, as a practical matter, almost all new agents use Wintrust Bank to

provide financing for the purchase of Allstate insurance agency books of business. Comm Deposition Testimony, **Appendix Tab 29**, at 54; Lukezic Decl. ¶ 63.

101.    Allstate Lending Connection is not aware of a single instance in which a bank agreed to lend money to a new agent without participating in the Allstate Lending Connection program and getting the Assignment of Commissions. Comm Deposition Testimony, **Appendix Tab 29**, at 54:1-21.

102.    As part of the Preferred Provider Marketing and Loan Origination Agreement, Allstate agreed to give Wintrust the exclusive status as its only preferred provider. **Appendix Tab 30** (Master Exhibit 57, at page 2); Comm Deposition Testimony, **Appendix Tab 29**, at page 22:4-15; Lukezic Decl. ¶ 65.

103.    On page 2 of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, marked as Master Exhibit 57, Allstate agreed not to promote any other lender in its Allstate Lending Connection program as a preferred provider of agency lending services. **Appendix Tab 30**, at 2 (Master Exhibit 57); Comm Deposition Testimony, **Appendix Tab 29**, at pages 22:16-24, 23:1-13; Lukezic Decl. ¶ 66.

104.    As part of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, Allstate agreed to give exclusive access to Wintrust to prospective agency owners. **Appendix Tab 30** at 2; Lukezic Decl. ¶ 67.

105.    As part of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, Allstate agreed to provide information to prospective agency owners in its training programs about who to contact at Wintrust or its designated Wintrust banks for further information about its lending services. **Appendix Tab 30**, at page 2; Lukezic Decl. ¶ 68.

106.    As part of the Preferred Provider Marketing and Loan Origination Agreement with

20

Wintrust, Allstate agreed to provide Wintrust with a list of new agency owners and their contact information. **Appendix Tab 30**, at 2.

107.    As part of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, Allstate agreed to provide Wintrust with a list of new agency owners and their contact information, and to refer to Wintrust in all relevant meeting materials as the preferred provider of agency lending services.  **Appendix Tab 30**, at 2; Lukezic Decl. ¶ 69.

108.    Wintrust is obligated under the Preferred Provider Marketing and Loan Origination Agreement to pay the loan origination fee to Allstate regardless of whether the lender does or does not participate in the Allstate Lending Connection program.  **Appendix Tab 30**, at 5; Comm Deposition Testimony, **Appendix Tab 29**, at page 59:13-20; Lukezic Decl. ¶ 70.

109.    As part of the Preferred Provider Marketing and Loan Origination Agreement with Wintrust, the borrower must pay loan processing fees to Allstate. Comm Deposition Testimony, **Appendix Tab 29**, at 42:2-4.

110.    Allstate benefits from the Allstate Lending Connection program because lenders feel more secure in loaning money to agencies, which helps to ensure there's money out there for agencies to buy books of business and grow their business. Comm Deposition Testimony, **Appendix Tab 29**, at 17:5-9.

111.    As provided under the Preferred Marketing and Loan Origination Agreement with Wintrust, Allstate provides an opportunity for Wintrust to attend and have a booth at Allstate regularly scheduled sponsored meetings of its agency owners, so that Wintrust can talk to agency owners. Comm Deposition Testimony, **Appendix Tab 29**, at 27:7-24; 29:10-24.

112.    The Allstate team members for the Allstate Lending Connection have a financial incentive to get as many new agents as possible to participate in the Allstate Lending Connection

program because their performance and compensation is based in part on the volume of the assignments of commissions they have placed.  Comm Deposition Testimony, **Appendix Tab 29**, at page 16:1-7; Lukezic Decl. ¶ 71.

113.    In connection with the purchase price for buying Fava and Buglione's agencies and becoming an Allstate insurance agent, Lukezic gave Wintrust's subsidiary Lake Forest Bank a note of $405,000, and gave a note to Mr. Fava for $75,000 and to Mr. Buglione for $108,500. Comm Deposition Testimony, **Appendix Tab 29**, at page 60:3-14; Lukezic Decl. ¶ 72.

114.    In connection with the financing of the purchase price, Lukezic was required to sign the following documents, including the Assignment of Commission Notice to Lender, Commission Payment Agreement, Deduction/Payment Authorization Form, Payment Election Form, and Assignment Processing Fee Declaration, in which it was agreed among Lukezic, the lender, and Allstate, that from the monthly commissions Allstate owed to Plaintiff, Allstate would deduct a monthly loan payment amount of $5,130.37 to be paid to the bank,  and that, from the first commission amount owed to Plaintiff, Allstate would deduct and keep a one-time fee of $██ for its "processing fee" and $██ for a "manual entry" fee.  **Appendix Tab 31** (Master Exhibit 58); Comm Deposition Testimony, Appendix Tab 29, at pages 63:2-24, 64:1-24, 65:1-3; Lukezic Decl. ¶ 73.

115.    The amount of the "processing fee" was arbitrary and that it was fixed at $██ regardless of whether there is more or less work involved.  Comm Deposition Testimony, **Appendix Tab 29**, at pages 65:15-24, 66:1-18; Lukezic Decl. ¶ 74.

116.    In connection with the financing of the Buglione purchase price, Lukezic was required to sign the following forms, including the Assignment of Commission Notice to lender, Commission Payment Agreement, Deduction Payment Authorization Form, Payment Election

Form, and Assignment Processing Fee Declaration, in which it was agreed among Lukezic, Mr. Buglione, Allstate and the lender that of Plaintiff's commission payment, an additional $4,520.83 will be deducted monthly and paid to Mr. Buglione, and Allstate would deduct and keep an additional $█ "processing fee" charge.  **Appendix Tab 32** (Master Exhibit 18); Comm Deposition Testimony, Appendix Tab 29, at page 68:8-24, 69:1-24, 70, 71; Lukezic Decl. ¶ 75.

117.     In connection with the financing of the Fava purchase price, Lukezic was required to sign the following forms, including the Assignment of Commission Notice to lender, Commission Payment Agreement, Deduction Payment Authorization Form, Payment Election Form, and Assignment Processing Fee Declaration, in which it was agreed among Mr. Fava, Plaintiff, Allstate and the lender that of Plaintiff's commission payment, an additional $3,125 will be deducted monthly and paid to Mr. Buglione, and Allstate would deduct and keep an additional $█ "processing fee" charge.  **Appendix Tab 33** (Master Exhibit 17); Comm Deposition Testimony, Appendix Tab 29, at page 72:1-24, 73:1-4; Lukezic Decl. ¶ 76.

118.     In total, Lukezic was required to pay Allstate $█ ($█ times three) from the first commission payment for "processing fees."  Comm Deposition Testimony, **Appendix Tab 29**, at , page 72:22-24, 73:1-4; Lukezic Decl. ¶ 77.

119.     In addition, in connection with Allstate's granting to the lender (Mr. Fava) a security interest in the commission payments, Lukezic was required to pay Allstate an additional $█ assignment processing fee.  Allstate Lending Connection Intake Form, **Appendix Tab 34** (Master Exhibit 61); Comm Deposition Testimony, **Appendix Tab 29,** at page 76:8-24; Lukezic Decl. ¶ 78.

120.     In addition, in connection with Allstate's granting to the lender (Mr. Buglione) a security interest in the commission payments, Lukezic was required to pay Allstate an additional

$█ assignment processing fee.  Allstate Lending Connection Intake Form, **Appendix Tab 35** (Master Exhibit 62); Comm Deposition Testimony, Appendix Tab 29, at page 77:4-24; Lukezic Decl. ¶ 79.

121.    The "processing fees" which Lukezic was required to pay Allstate were described by Allstate in the Allstate pay notifications to me as a "commission startup fee."  Email from Allstate Lending Connection, dated July 22, 2024, **Appendix Tab 36** (Master Exhibit 63); Comm Deposition Testimony, **Appendix Tab 29**, at page 79:14-19; Lukezic Decl. ¶ 80.

Dated:  January 20, 2026
        New York, New York

Respectfully submitted,

**WUERSCH & GERING LLP**

*/s/ David T. Azrin*
David T. Azrin
Ramsha Ansari
Wuersch & Gering LLP
88 Pine Street, 20th Floor
New York, N.Y.  10005
Tel. (212) 509-4745
Fax. (212) 509-9559
Email: David.Azrin@wg-law.com
*Attorneys for Plaintiff Old Slip Benefits &*
*Insurance Services, LLC*