UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLD SLIP BENEFITS & INSURANCE SERVICES, LLC, Plaintiff, v. ALLSTATE INSURANCE COMPANY and ALLSTATE FINANCIAL SERVICES, LLC, Defendants. | **OPINION AND ORDER** 25 CV 1110 (VB) |

Briccetti, J.:

Plaintiff Old Slip Benefits & Insurance Services, LLC, brings this action against defendants Allstate Insurance Company ("Allstate"), and Allstate Financial Services, LLC ("AFS"), alleging fraudulent inducement, breach of the implied covenant of good faith and fair dealing, and violation of the New York Franchise Sales Act ("NYFSA").[1]

Now pending are defendants' motion for summary judgment (Doc. #93) and plaintiff's cross-motion for partial summary judgment (Docs. ##89, 106).[2]

For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART and plaintiff's cross-motion is DENIED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

---

1 The action was removed from Supreme Court, County of Westchester, on the basis of diversity jurisdiction.

2 Both parties filed publicly redacted and sealed unredacted versions of their respective motions and accompanying papers. For purposes of the instant motion, when appropriate, the Court will refer to the unredacted, sealed versions of the filings.

## BACKGROUND

The parties have submitted briefs, statements of material facts pursuant to Local Civil Rule 56.1, and declarations with exhibits.[3] These submissions reflect the following factual background.

I. James Lukezic Becomes an Allstate Agent

Allstate is an insurance company that sells various insurance and financial products and, through affiliates like AFS, sells securities products, including mutual funds, variable annuities, and variable life insurance. Allstate offers an "Exclusive Agency Program" under which individuals may represent Allstate as independent contractor insurance agents. An individual may either buy an existing Allstate agency or open a new one. When an individual purchases an existing agency, the individual buys the economic interest in that agency's book of business.

James Lukezic owns and operates a group of businesses collectively known as "Old Slip," consisting of three entities: (i) Old Slip Registered Investment Advisors, LLC, an investment advisory business; (ii) Old Slip Benefits & Insurance Services, LLC, a licensed insurance agency, and the plaintiff in this action; and (iii) Old Slip Capital Management, Inc., a mutual fund retailer and broker-dealer.

---

[3] In addition to a counterstatement filed pursuant to Local Rule 56.1(b) (Doc. #118), plaintiff improperly filed a "Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment." (Doc. #117). However, because the Court has discretion to construe other submissions as a counterstatement, points made in this submission will be construed as counterstatements to the extent they both (i) directly address facts set forth in defendants' 56.1 statement, and (ii) are supported by admissible evidence in the record. See Little v. City of New York, 487 F. Supp. 2d 426, 432 (S.D.N.Y. 2007) (construing attorney affirmation and exhibits as a 56.1 statement). Further, defendants improperly filed a "Response to Plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment." (Doc. #142). The Court will only consider this submission to the extent it responds to the new facts submitted in plaintiff's "Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment." See Roth v. Cheesecake Factory Rests., Inc., 2021 WL 1103505, at *2 (S.D.N.Y. Feb. 5, 2021), report and recommendation adopted, 2021 WL 912416 (S.D.N.Y. Mar. 10, 2021).

On August 31, 2023, Mr. Lukezic was first introduced to Allstate as a prospective buyer of an existing agency. Mr. Lukezic was introduced to James Hoffsher, an Allstate sales employment specialist, by a business intermediary, Stephanie Sousa. Mr. Lukezic testified he told Allstate's salespersons he intended to continue his investment advisory business and cross-sell Allstate insurance products to those customers. According to Mr. Lukezic, the Allstate salespersons were "ecstatic about the cross-sell idea." (Doc. #120 ("Appendix") Tab 36 at Tr. at 205). Mr. Lukezic further testified he told Allstate personnel he would not agree to transfer his Financial Industry Regulatory Authority ("FINRA") licenses to AFS. According to Mr. Lukezic, Allstate personnel represented that it would be "okay" for him to keep his FINRA licenses. (Doc. #119 ¶ 57). In his deposition, Mr. Lukezic described Allstate and AFS employees with whom Mr. Lukezic corresponded in the sales process as knowing "little to nothing about everything" and being "a little less than professional." (See Doc. #99 ("Young Decl.") Ex. 1 at Tr. 124–28).

Shortly after his first interaction with Allstate, Mr. Lukezic contacted Wintrust Bank to secure financing, and prepared a business plan for his prospective agency. Mr. Lukezic testified that Mr. Hoffsher had recommended three or four banks that had previously done business with Allstate. (Young Decl. Ex. 1 at Tr. 98). Mr. Lukezic ultimately purchased economic interests in two existing Allstate exclusive agencies from two individual sellers, Anthony Fava and Alfred Buglione. Although Allstate was not a party to the transactions between Mr. Lukezic and Mr. Fava and Mr. Buglione, the respective agreements between Allstate and each seller required Allstate's written approval before any transfer of economic interest, so Allstate had to approve Mr. Lukezic's purchase of the agencies. Allstate's approval was conditioned on the termination

of the agreements between Allstate and Mr. Fava and Mr. Buglione and on Mr. Lukezic executing the then-current version of the agency agreement with Allstate.

On December 4, 2023, Allstate approved Mr. Lukezic's purchase of the economic interests from Mr. Fava and Mr. Buglione. Allstate had no involvement in drafting the agreements or determining the purchase price for the agreements entered into between Mr. Lukezic and Mr. Fava or Mr. Buglione. Allstate also did not receive any portion of the purchase price, which incorporated the price of certain equipment Mr. Lukezic purchased from Mr. Fava and Mr. Buglione.

Both Mr. Fava and Mr. Buglione agreed to be paid partially at closing and to receive the remaining amounts in twenty-four equal monthly installments. Mr. Lukezic partially funded the upfront payment with a loan from Lake Forest Bank & Trust Company, N.A. ("Lake Forest Bank"), an affiliate of Wintrust Bank. To cover the amounts owed to Mr. Buglione, Mr. Fava, and Lake Forest Bank, Mr. Lukezic elected to use Allstate's Assignment of Commission program, a voluntary program that allows a seller to obtain a fixed payment from the commissions the agency earns. When agents and lenders participate in this program, Allstate deducts fixed monthly amounts from the agent's commissions and remits that amount to the lenders. Allstate charges a processing fee for parties who enter into Assignment of Commission agreements. Mr. Lukezic entered into this arrangement with Mr. Buglione, Mr. Fava, and Lake Forest Bank, which allowed Mr. Buglione, Mr. Fava, and Lake Forest Bank to receive Mr. Lukezic's commissions until he paid back the amounts owed to them.

Mr. Lukezic signed a "Pre-Appointment Agreement" with Allstate, which provided that, to be offered an agency agreement, an applicant had to complete "all requirements of the Allstate Exclusive Agency pre-appointment program" and agree to "all of the current terms and

conditions of the [agency agreement] and its incorporated materials." (Doc. #118 at ¶ 31). The incorporated materials include the Supplement for the R3001 Agreement ("Supplement"), the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards"). (Doc. #118 at ¶ 32).

II. The R3001 Agency Agreement

On February 21, 2024, Allstate executed the R3001 Agency Agreement (the "Agreement") with plaintiff, effective March 1, 2024. (Young Decl. Ex. 25). Under the Agreement, plaintiff agreed to act as an "agent of [Allstate] for the purpose of soliciting, selling, and servicing insurance . . . ." (Id. § II.A). Further, Allstate has "sole discretion" to determine the "premiums, fees, charges for insurance and other [Allstate] Business." (Id. at. § I.F.)

The Agreement provides that Old Slip Benefits & Insurance Services, LLC (referred to in the Agreement as "Agency") "will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of [Allstate]." (Id. at § I.E). It also provides that either party may terminate the Agreement without cause upon 90 days' prior written notice. (Id. at § XVII.B.2). Upon termination, the Agency is entitled to "receive compensation pursuant to Section XV. from [Allstate] for the period up to and including the specified termination date." (Id.)

The Agreement also contains a no-modification clause, providing that it "may not be modified except by a written agreement between [Allstate] and Agency which expressly states that it modifies this Agreement," that no "other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement," and that no "representative of [Allstate] will have authority to modify this

Agreement, except as provided in this Section XXI." (Id. at § XXI.C). Per the integration clause, the Agreement constitutes "the sole and entire agency agreement" between the parties, "supersedes and replaces any prior employment, agency, or other agreement between [Allstate] and Agency and any of its officers, directors, shareholders, members, and employees," and "supersedes any prior oral statements and representations by [Allstate]." (Id. at § I.B).

The Agreement expressly incorporated the Supplement, the EA Manual and the Agency Standards in their entirety. (Young Decl. Ex. 25 at § I.C). Although the Agreement contains an acknowledgement that the Agency "reviewed the Supplement, EA Manual, and Agency Standards" (id. at § XXI.D), the parties dispute whether Mr. Lukezic had access to those materials before executing the Agreement with Allstate.

The EA Manual states that "[a]s an R3001 Agent, you are an exclusive writer for Allstate, except for certain types of business specified in the R3001 Agreement and the Supplement, e.g., residual market business and expanded market coverage business." (Young Decl. Ex. 26 at 6). It also provides that an agent who does not become a registered representative of AFS "will be permitted to retain any FINRA licenses you obtained prior to being appointed by the Company (provided you meet FINRA requirements) solely for the purpose of receiving trailing commissions (residuals) on business you produced for another company prior to your appointment," and that such an agent "may not place any further business (variable annuities, variable life, and mutual funds) or perform any service work for customers of the other company," and further provides in a footnote that all "appointments after 8/1/2000 must affiliate with Allstate Financial Services, LLC." (Id. at 10).

The EA Manual also states that "[a]s an R3001 Agent, you may be involved in other business. However, you may not be involved (other than through a passive financial interest) in

any insurance or other business in which insurance products or mutual funds are sold," that "[y]ou may not represent or solicit business for any other company, agent or broker, except as permitted by the Company," and that Allstate's position is that an agent "should not take part in any activities that might prove to place you or your agency in a conflict with respect to the duties you owe to Allstate." (Young Decl. Ex. 26 at 22, 42, 44).

The EA Manual further provides that agents must have an Errors and Omissions ("E&O") insurance policy for professionals with certain securities licenses and must include coverage for "all Allstate and non-Allstate products you are authorized to sell and/or service including, but not limited to, residual markets, flood, bank and securities products." (Young Decl. Ex. 26 at 27, 29). Under the conflicts of interest section of the EA Manual, an agent, as an independent contractor, "can conduct other businesses" but "may not have other duties or interests that would conflict with your duties under your R3001 Agreement." (Id. at 42).

The EA Manual's preface states:

> The Manual is intended to be consistent with the express terms and conditions of the R3001 Agreement. To the extent that there is any conflict between any of the provisions of the Manual and the express written terms of the R3001 Agreement, the R3001 Agreement shall govern.

(Young Decl. Ex. 26 at 2).

To establish and operate the agency, Mr. Lukezic purchased office equipment from the Computer Data Warehouse, an online store where agents may purchase computers or equipment for their agency. Mr. Lukezic also purchased signage and stationery from Allstate's preferred vendor. He purchased business cards directly from Allstate, which collects the amount and passes it through to the vendor it uses for business cards. Allstate provides its agents with a security key fob, a technology allowance, and a computer at no cost.

III. Plaintiff's Alleged Violations and Notice of Termination

Within a month of the Agreement's effective date, Allstate's Sales Leader Regine Napoleon was alerted by email on March 25, 2024, that the Buglione book of business could not be transferred to Mr. Lukezic until it was confirmed whether Mr. Lukezic was maintaining an outside independent agency partnership in Old Slip Benefits and Insurance Services, LLC. Ms. Napoleon emailed Mr. Lukezic notifying him that "as an Exclusive Allstate Agent you aren't permitted to carry any appointment with other companies unless appointed through Allstate" and asked him to "confirm that you are no longer affiliated with Old Slip Benefits and Insurance Services, LLC." (Young Decl. Ex. 41). Mr. Lukezic responded that those insurance appointments were with annuity providers, which he writes through a separate business, and that he writes property and casualty insurance only through Allstate.

While Mr. Lukezic and his attorney were corresponding with Allstate personnel, Allstate's Human Resources and Law Department (the "HR Department") opened an internal investigation into these issues. The investigation ran from late March through June 2024. The investigation confirmed Mr. Lukezic continued to operate a broker-dealer and investment advisory businesses affiliated with Old Slip Benefits and Insurance Services, LLC after executing the Agreement. The investigation also confirmed Mr. Lukezic held life and accident appointments with insurance carriers not approved by Allstate. Plaintiff maintains these appointments were limited and only for the purpose of selling variable annuities. During the investigation, Allstate sent plaintiff's counsel two letters requesting that plaintiff divest any interests in the investment advisory and brokerage business and comply with the "unauthorized brokering restriction stated in the Agreement." Plaintiff refused to do so. (Doc. #118 at ¶ 98).

As a result, on June 12, 2024, the HR Department recommended the Agreement with Allstate be terminated. Allstate sent a notice of termination (the "Notice") to plaintiff on June 25, 2024. The Notice stated that plaintiff "may have the option of accepting a termination payment from Allstate or selling the economic interest to an approved buyer." (Doc. #98-3).[4]

## DISCUSSION

### I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any declarations show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[5]

A fact is material when it "might affect the outcome of the suit under governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby,

[4] Prior to the removal of the case from state court, plaintiff sought a Temporary Restraining Order ("TRO") to prevent Allstate from terminating the Agreement. (Doc. #15-9.) The state court granted the TRO, preventing Allstate from terminating the Agreement until it decided plaintiff's preliminary injunction motion. (Id.). Following removal from state court, defendants moved to declare the TRO expired, or alternatively, for an order dissolving it. (Doc. #12). Judge Clarke, to whom this case was then assigned, held the TRO had expired but stayed the effect of her order to permit plaintiff to seek an emergency stay from the Second Circuit. (Doc. #48). Plaintiff then moved for a stay of the order pending appeal. (Doc. #52-1). The Second Circuit granted a temporary stay of the order pending decision by a motions panel. (Doc. #56). The status of the preliminary relief plaintiff obtained is pending before the Second Circuit. Oral argument has been scheduled for September 23, 2026.

[5] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). "[T]he mere existence of a scintilla of evidence" supporting the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77,82–83 (2d Cir. 2004). Bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II. Fraudulent Inducement Claim

Defendants argue they are entitled to summary judgment on plaintiff's fraudulent inducement claim.

The Court disagrees.

A. Legal Standard

"[T]o establish a fraudulent inducement claim, a plaintiff must prove (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff." Larkin v. Saber Auto., LLC, 736 F. Supp. 3d 193, 206 (S.D.N.Y. 2024). "At the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." Waran v. Christie's Inc., 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018).

B. Analysis

Defendants challenge only the reliance and injury elements of the fraudulent inducement claim. The Court will address each element in turn.

1. Reliance

Plaintiff's fraudulent inducement claim is based upon the alleged representation by Allstate personnel that Mr. Lukezic (i) did not have to transfer his FINRA licenses to AFS, and (ii) he could continue to sell and service outside customers for non-insurance financial products and cross-sell Allstate insurance products to those customers.

To make out a fraudulent inducement claim, plaintiff must demonstrate that its reliance on the misrepresentations was reasonable. Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC,

2019 WL 13414324, at *11 (S.D.N.Y. Sept. 10, 2019). The reasonableness of plaintiff's alleged reliance depends on the complexity and magnitude of the transaction, the sophistication of the parties, and the content of any agreements between them. Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 189, 195 (2d Cir. 2003). Under New York law, "[a] party's reliance is not reasonable where it is directly contradicted by a contractual provision." CapLOC, LLC v. McCord, 2018 WL 3407708, at *10 (S.D.N.Y. June 12, 2018). However, "reasonable reliance is often a question of fact for the jury rather than a question of law for the court." STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC, 648 F.3d 68, 81 (2d Cir. 2011).

Defendants argue the Agreement "flatly" contradicts these oral representations and therefore plaintiff cannot claim reasonable reliance as a matter of law. (Doc. #100 at 10). Defendants point to provisions in the EA Manual, expressly incorporated into the Agreement, permitting agents not affiliated with AFS to retain prior FINRA licenses only to receive trailing commissions, but prohibiting agents from selling unauthorized variable annuities, variable life insurance, and mutual funds, or from servicing customers of another company. (Young Decl. Ex. 26 at 10). The EA Manual also prohibits agents from being involved in certain outside businesses, including "in any insurance or other business in which insurance products or mutual funds are sold," requires that agents avoid "other duties or interests that would conflict" with their obligations, and bars agents from representing or soliciting business "for any other company, agent or broker" absent Allstate's permission. (Id. at 22, 42, 44).

However, plaintiff has raised a genuine issue of material fact that the Agreement is ambiguous as to whether Mr. Lukezic could maintain his current securities license and sell non-Allstate non-insurance products to the customers of his investment advisory business. Plaintiff argues that, although the plain language of the Agreement restricts plaintiff from

offering insurance products of other companies, Section I.E. of the Agreement does not explicitly prohibit Mr. Lukezic from maintaining his securities license and selling non-Allstate non-insurance products to his customers. Plaintiff further contends defendants' reliance on the EA Manual is misplaced because the EA Manual's language is itself ambiguous and inconsistent. Plaintiff points to provisions in the EA Manual suggesting agents are allowed to sell other non-insurance products. For example, the EA Manual requires agents to carry E&O insurance for all non-Allstate products "you are authorized to sell" including "securities products." (Young Decl. Ex. 26 at 27, 29). Under the "Conflicts of Interest" section of the EA Manual, an agent, as an independent contractor, "can conduct other businesses" but "may not have other duties or interests that would conflict with your duties under your R3001 Agreement." (Id. at 42).

And, according to plaintiff, even if the EA Manual can be interpreted as prohibiting the sale of non-insurance securities products, "[t]o the extent there is any conflict between the EA Manual and the express written terms of the R3001 Agreement, the R3001 Agreement shall govern." (Young Decl. Ex. 26 at 2). This means that the R3001 Agreement, which only prohibits plaintiff from selling other insurance products (Young Decl. Ex. 25 at § I.E), supersedes any conflicting interpretation.

Thus, the written agreements, standing alone, do not establish that plaintiff's reliance was per se unreasonable. Accordingly, the Court cannot say as a matter of law that the governing agreements expressly and unambiguously contradict plaintiff's supposed understanding regarding his outside activities. See LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp., 424 F.3d 195, 205 (2d Cir. 2005) ("[W]hen the meaning of the contract is ambiguous and the intent of the parties becomes a matter of inquiry, a question of fact is presented which cannot be resolved on a motion for summary judgment.").

Evening assuming the written agreements do not expressly contradict any alleged misrepresentations, defendants nevertheless argue that plaintiff's reliance was unjustified.

First, defendants contend plaintiff is a sophisticated business entity which triggered a duty to further inquire. According to defendants, Mr. Lukezic possessed the EA Manual and Pre-Appointment Agreement before entering into the Agreement and had learned the conditions for entering the Agreement through plaintiff's purchase of Mr. Fava's and Mr. Buglione's economic interests. Therefore, to the extent those terms and conditions conflicted with plaintiff's supposed understanding regarding outside activities, Mr. Lukezic—as a sophisticated businessman—should have inquired further, and the failure to do so amounts to unreasonable reliance as a matter of law.

This argument is unavailing.

"A defrauded party generally has no duty to exercise formal due diligence but must avoid recklessness by exercising minimal diligence and must exercise a heightened degree of diligence when confronted with hints of falsity." Bhagat v. Shah, 2025 WL 1918014, at *6 (S.D.N.Y. July 2, 2025), report and recommendation adopted, 2025 WL 2396668 (S.D.N.Y. Aug. 18, 2025). Although Mr. Lukezic arguably had access to information that may have suggested the alleged oral representations were inaccurate, the Court cannot say as a matter of law that the possession of the EA Manual and the Pre-Appointment Agreement put Mr. Lukezic on notice that the alleged representations had such "hints of falsity" as to require Mr. Lukezic to exercise a heightened degree of diligence. See JP Morgan Chase Bank v. Winnick, 350 F. Supp. 2d 393, 409 (S.D.N.Y. 2004) (summary judgment denied when "reasonable fact-finder could conclude that the financial documents provided would not, on their face, have alerted [plaintiffs] to potential fraud").

Second, defendants point to "obvious red flags" that should have triggered further inquiry. Defendants argue that, as a "licensed agent," plaintiff knew or should have known that the New York Insurance Law would make plaintiff an independent agent rather than an exclusive agent. That statute—combined with the fact that the alleged misrepresentations came from individuals whom Mr. Lukezic deemed to know "little to nothing about everything" and were "a little less than professional"— should have, according to defendants, at least prompted plaintiff to inquire further. (See Young Decl. Ex. 1 at Tr. 124–28).

But nothing in Section 2101(b) of the New York Insurance Law, which defines an "independent insurance agent," would have made clear to Mr. Lukezic that the alleged misrepresentations were obviously false. N.Y. Ins. L. § 2101(b). And, according to plaintiff, Mr. Lukezic "only later realized" that some of those individuals with whom he was dealing might not fully understand the licensing requirements and Allstate's policies. (Doc. #121 at 12). At this stage of the case, with all reasonable inferences drawn in plaintiff's favor, the Court cannot say these facts constitute "red flags" that should have prompted further investigation. See Bhagat v. Shah, 2025 WL 1918014, at *7.

Finally, defendants contend the integration clause within the parties' Agreement negates reasonable reliance. Not so. "[M]erger clauses generally do not bar claims for fraudulent inducement, unless the clause specifically addresses the very conduct complained of in the fraud allegation." Ambac Assurance Corp. v. EMC Mortg. Corp., 2010 WL 11595698, at *18 (S.D.N.Y. Dec. 16, 2010). The integration and no-modification clauses defendants cite do not pertain to the specific subject of the alleged misrepresentations. (Young Decl. Ex. 25 § I.B, XXI.C). Indeed, these clauses are the very the type of "standard boilerplate" general merger

clauses that New York courts have held do not preclude fraudulent inducement claims. Ambac Assurance Corp. v. EMC Mortg. Corp., 2010 WL 11595698, at *18.

2. Injury

Defendants next contend plaintiff's fraudulent inducement claim fails because plaintiff seeks no damages independent from the damages stemming from the implied covenant of good faith and fair dealing claim.

The Court disagrees. Defendants are correct that a plaintiff may not assert a fraudulent inducement claim seeking damages that are duplicative of those recoverable from an implied covenant of good faith claim, which is a contractual cause of action. See Basri v. Gordon, 2025 WL 949578, at *13 (S.D.N.Y. Mar. 28, 2025). However, plaintiff identifies at least one injury distinct from the implied covenant of good faith claim. (See Doc. #69 ¶ 85 (alleging fraudulent inducement caused loss of start-up costs plaintiff incurred, such as liabilities to landlords and banks)).

Accordingly, plaintiff's fraudulent inducement claim may proceed.

III. Implied Covenant of Good Faith and Fair Dealing Claim

Defendants argue plaintiff cannot prevail on its implied covenant claim because plaintiff cannot show defendant deprived it of a benefit to which it was entitled under the contract.

The Court agrees.

A. Legal Standard

Under New York law, "[i]mplicit in every contract is a covenant of good faith and fair dealing which encompasses any promise that a reasonable promisee would understand to be included." 25 Bay Terrace Assocs., L.P. v. Pub. Serv. Mut. Ins. Co., 144 A.D.3d 665, 667 (2d Dep't 2016). "The implied covenant of good faith and fair dealing is breached when a party acts

in a manner that would deprive the other party of the right to receive the benefits of their agreement." 1357 Tarrytown Rd. Auto, LLC v. Granite Props., LLC, 142 A.D.3d 976, 977 (2d Dep't 2016). However, the implied covenant "arises only in connection with the rights or obligations set forth in the terms of the contract[.]" In re LIBOR–Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606, 632 (S.D.N.Y. 2013).

B. Analysis

Plaintiff claims defendants breached the implied covenant because Allstate's termination of the Agreement deprived plaintiff of the expected benefit of simultaneously operating its separate investment business alongside the Allstate agency and cross-selling Allstate products to outside clients.

Plaintiff first relies on the language of the Agreement. But the Agreement does not entitle plaintiff to this benefit. Plaintiff does not—and cannot—point to any provision in the Agreement that compels defendants to grant plaintiff the right to operate outside businesses or "cross-sell" any products. Although the contract is arguably ambiguous as to whether plaintiff is prohibited from doing so (see supra Section III.B.1), it unambiguously does not require defendants to provide plaintiff this benefit.

Plaintiff also argues it is entitled to this benefit, irrespective of the terms of the agreement, because Mr. Lukezic reasonably understood that he would be permitted to continue his separate securities business based on defendants' alleged oral assurances. Although the implied covenant of good faith and fair dealing "incorporates any promises which a reasonable person in the position of the promisee would be justified in understanding were included," Payday Advance Plus, Inc. v. Findwhat.com, Inc., 478 F. Supp. 2d 496, 503 (S.D.N.Y. 2007), it does not include any obligation that would "add to a party's substantive obligations" under the

contract. Higgs v. Columbia Univ., 2009 WL 77880, at *12 (S.D.N.Y. Jan. 6, 2009). Plaintiff here identifies no contractual right it had earned and lost because of Allstate's lawful termination. Rather, plaintiff "seeks to impose an obligation" on Allstate that is "nowhere in, and was not contemplated by" the Agreement—namely, an obligation that defendants continue to allow Mr. Lukezic to maintain his outside securities business while simultaneously acting as an Allstate agent. Ray Legal Consulting Grp. v. DiJoseph, 37 F. Supp. 3d 704, 726 (S.D.N.Y. 2014).

Further, there can be no breach of the implied covenant of good faith and fair dealing "[w]hen [defendants'] actions are consistent with an agreement's express and specific provisions." Broadway 104, LLC v. XL Ins. Am., Inc., 545 F. Supp. 3d 93, 103 (S.D.N.Y. 2021). Here, Section XVII of the Agreement gives either party the ability to terminate the Agreement so long as appropriate notice is given. In light of this termination provision, even construing the facts and drawing all reasonable inferences in plaintiff's favor, Allstate's actions were consistent with the terms of the Agreement.[6]

Thus, as a matter of law, Allstate's termination of the Agreement cannot constitute a breach of the implied covenant of good faith and fair dealing.[7]

---

[6] Plaintiff's reliance on JLO Dev. Corp. v. Amalgamated Bank, 232 A.D.3d 705, 707 (2d Dep't 2024), is unpersuasive. In that case, the court upheld the implied covenant claim when defendant terminated the agreement two weeks prior to the completion of the work to avoid paying plaintiff, despite plaintiff having already expended years of work. Although there was a similar termination provision as here, the plaintiff in that case identified a specific, contractual benefit that was cut off by termination. Plaintiff here identifies no compensation or contractual right it had earned and lost because of Allstate's lawful termination.

[7] Plaintiff's reliance on the state court's prior decision not to dismiss the implied covenant claim is misplaced because that court decided only that the complaint stated a claim for relief but not that the claim would survive summary judgment.

IV. Cross-Motions for Summary Judgment on the NYFSA Claim

Each side disputes whether the NYFSA applies to the relationship between plaintiff and Allstate. Plaintiff moves for partial summary judgment on the ground that it does, and defendants move for summary judgment on the ground that it does not.

The Court agrees with defendants.

A. Legal Standard

Under the NYFSA, an agreement, "either expressed or implied," may constitute a franchise if:

> (i) [a] franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee, or
>
> (ii) [a] franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee.

N.Y. Gen. Bus. L. § 681(3)(a)-(b). Both types of arrangements require a franchisee to pay a fee "for the right to enter into a business under a franchise agreement or otherwise sell, resell or distribute goods, services, or franchises under such an agreement." N.Y. Gen. Bus. L. § 681(7). The payment of a franchise fee is an "essential element" of a franchise under Section 681(3)(a) and (b). Kennedy v. Lomei, 173 A.D. 2d 684, 685 (2d Dep't 1991).

B. Analysis

Even viewing the facts in the light most favorable to plaintiff, plaintiff has not shown its relationship with Allstate was one of franchisor-franchisee as contemplated by the NYFSA. Plaintiff argues it was granted the right to engage in the business of offering Allstate insurance policies and offering customer service to Allstate policyholders.

But the provisions of the Agreement belie any such claim. Per the Agreement, plaintiff neither buys Allstate's policies nor owns them. (Young Decl. Ex. 25 at § I.A). Allstate has "sole discretion" to determine the premiums, fees, and charges for insurance (id. at. § I.F.), meaning the "type of risk undertaken by [Old Slip] was far different from the risk in a typical franchise arrangement." See Garbinski v. Nationwide Mut. Ins. Co., 2012 WL 3027918, at *9 (D. Conn. July 24, 2012) (assessing similar franchise statute under Connecticut law).[8] Although Old Slip was responsible for promoting the sale of Allstate products, it could not use advertising materials or promotional plans or devices that referenced Allstate without obtaining prior written approval. (Young Decl. Ex. 25 at § VI). Allstate was required to defend and indemnify Old Slip against any liability relating to damages sustained by policyholders and caused by Allstate. (Id. at § X.A). These are not the characteristics of a typical franchisor-franchisee relationship.

This conclusion is buttressed by the fact that Old Slip was deemed an agent of Allstate under the Agreement (Young Decl. Ex. 25 at § II.A.), and "one who acts as an agent for another in selling a product does not ordinarily qualify as a franchisee." Trade Links, LLC v. BI-QEM SA de CV, 2020 WL 1335688, at *10 (D. Conn. Mar. 23, 2020). Thus, Old Slip cannot be said to be "in the business of offering, selling, or distributing goods or services . . . ." N.Y. Gen. Bus. L. § 681(3)(a). See, e.g., Garbinski v. Nationwide Prop. & Cas. Ins. Co., 523 F. App'x 24, 27

---

[8] The NYFSA is substantially identical to Connecticut's Franchise Act, Conn. Gen. Stat. Sections 42–133e to 42–133g. Compare Conn. Gen. Stat. Ann. § 42-133e ("'Franchise' means an oral or written agreement or arrangement in which . . . a franchisee is granted the right to engage in the business of offering, selling or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . .") with N.Y. Gen. Bus. L. § 681 ("'Franchise' means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which . . . [a] franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor . . . .").

(2d Cir. 2013) (no franchise relationship under Connecticut Franchise Act); Rudel Mach. Co. v. Giddings & Lewis, Inc., 2001 WL 36210782, at *2 (D. Conn. July 25, 2001) ("Being involved in the process of promoting another's products simply is not the same as having been granted the right to engage in the business of selling them.").

In any event, even if Old Slip was granted the right to offer, sell, or distribute goods or services under the NYFSA, it cannot show it paid Allstate a franchise fee. Under the NYFSA, a franchise fee is "any fee or charge that a franchisee" is obligated to pay, "directly or indirectly," to the franchisor "for the right to enter into a business under a franchise agreement." N.Y. Gen. Bus. L. § 681(7). Franchise payments can include payments made in the form of a lump sum, profits or cash flow, or those reflected in the price of goods, services, equipment or inventory. N.Y. Comp. Codes R. & Regs. tit. 13, § 200.1.

Plaintiff points to two types of payments that it contends satisfy this requirement. First, plaintiff purchased required technology equipment and branding materials. Second, plaintiff claims Allstate collected processing and "kickback" fees, which constitute a hidden franchise fee.

Neither payment, however, constitutes a franchise fee.

As to the first type of payment, plaintiff claims it paid Allstate a franchise fee when it purchased equipment it claims was required as a condition for entering into the Agreement. (Doc. #105 at 21). Plaintiff claims Mr. Lukezic purchased office equipment from third-party sellers Mr. Fava and Mr. Buglione because Allstate employee Ms. Napoleon told Mr. Lukezic he was required to do so.

No reasonable jury could find that Ms. Napoleon told Mr. Lukezic he was required to purchase equipment from Mr. Fava or Mr. Buglione, or that Allstate directed Ms. Napoleon to do

so. Rather, the record is clear that Allstate had no involvement in the purchase agreements entered between Mr. Lukezic and Mr. Fava or Mr. Buglione (Doc. ##111-31 at Tr. 159; 124 at ¶ 4, 6–7). Also, Allstate did not receive any portion of the purchase price, which included the purchase of such equipment.

Plaintiff also claims it purchased other required equipment from Allstate's designated vendor as a condition of becoming and remaining an Allstate agent, including computer monitors, docking stations, phones, and a security key fob. However, the record does not show that Allstate required Mr. Lukezic to purchase that equipment from Allstate's vendor as a condition of becoming and remaining an Allstate agent. This conclusion is buttressed by the fact that Allstate provided its agents a computer, a security key fob, and an annual allowance to purchase technology. And even when Mr. Lukezic elected to purchase office equipment from Allstate's vendor, it is undisputed that no portion of that payment went to Allstate. (Doc. #118 ¶¶ 61, 64). Thus, none of Mr. Lukezic's alleged equipment purchases were made for the purpose of entering into business. See Nature's Plus Nordic A/S v. Nat. Organics, Inc., 980 F. Supp. 2d 400, 416 (E.D.N.Y. 2013) (finding advertising payment not made "for the right to enter into" franchise business and, therefore, not a franchise fee).

Plaintiff further claims it paid Allstate a franchise fee because plaintiff was required to purchase branding and office materials. Not so. The record does not show Allstate required plaintiff to purchase these items as a condition of remaining an Allstate agent, or that Allstate received any payment for these purchases.[9]

[9] It is undisputed that plaintiff paid Allstate directly for business cards. (Doc. #118 at ¶ 71). Under this arrangement, Allstate collects the amount and passes it through to the vendor. It is also undisputed that the agreement with its vendor provides for an early payment discount if Allstate pays the invoice within 20 days. (Doc. #130 at ¶ 76). However, there is no evidence—and plaintiff does not point to any—showing Allstate received a discount in connection with Mr.

At bottom, based on the present record, these items are nothing more than ordinary business expenses and cannot be described as fees paid for the right to enter or maintain a business relationship. See In re Matterhorn Grp., Inc., 2000 WL 1174215, at *9 (Bankr. S.D.N.Y. Aug. 17, 2000) (franchise fee does not include payment for ordinary business expenses).

As to the second category of payments—so-called processing and "kick back" fees—plaintiff claims the processing fees paid to Allstate in connection with the Assignment of Commission arrangement qualify as indirect franchise fees. It is undisputed that Mr. Lukezic entered into three separate commission payment agreements to cover the amounts owed to Mr. Fava, Mr. Buglione, and Lake Forest Bank. And Allstate charges a processing fee for entering into such agreements. But this was a purely optional financial arrangement of which Mr. Lukezic chose to take advantage. (See Doc. #118 at 23). The associated processing fee, therefore, does not constitute a fee for the right to enter into business. Further, plaintiff claims it was required to obtain a loan through Lake Forest Bank, which is a Wintrust affiliate, from whom Allstate allegedly receives a kickback. The record does not suggest plaintiff was required to borrow through that specific lender. (Doc. #104-31 at Tr. 98). Nor does it reflect that Lake Forest paid Allstate a percentage of Mr. Lukezic's loan amount. (Docs. ##104-30 §§ 4(a), 4(b)(1), 4(b)(3)–(4); 104-29 at Tr. 31–32, 36, 57–58).

Accordingly, the NYFSA does not apply to the relationship between plaintiff and Allstate. Therefore, defendants' motion for summary judgment on the NYFSA claim must be granted, and plaintiff's cross-motion must be denied.

---

Lukezic's order or that Allstate in any way received a portion of the invoice fee in connection with Mr. Lukezic's business cards order. And even if it did, such a fee would not be significant enough to meaningfully constitute a franchise fee.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's cross-motion for partial summary judgment is DENIED.

To summarize, defendants are entitled to summary judgment on plaintiff's breach of the implied covenant of good faith and fair dealing claim and its NYSFA claim. Those claims are dismissed. Plaintiff's fraudulent inducement claim may proceed.

The Court will conduct a case management conference on **September 16, 2026, at 9:30 a.m.**, to be held in person at the White Plains courthouse, Courtroom 620, at which time counsel shall be prepared to discuss, among other things, the setting of a trial date and a schedule for pretrial submissions, as well as what good faith efforts they have made and will continue to make to settle this case. To be clear, counsel are directed to discuss settlement in good faith prior to that date.

The Clerk is instructed to terminate the motions. (Docs. ##89, 93).

Dated: August 6, 2026
White Plains, NY

SO ORDERED:

Vincent L. Briccetti
United States District Judge